Third. As to the dismissal of the indictments: The question to be decided in this motion is whether the Hart-Agnew law (Laws 1908, c. 507), passed in the state Senate on the 11th day of June, 1908, by a vote of 26 to 25, is in reality a binding statute. The defendants claim that it is not. They claim that the Hart-Agnew law as a matter of constitutional law never received a majority of the lawful votes in the Senate,. and, if it did not, then the Legislature's adoption of the compilation by the Board of Statutory Revision of the contents of the statute books did not give life and existence as a statute to such law.

In support of this contention the learned attorneys representing the defendants herein have submitted to me a very voluminous and exhaustive brief, in which this question is ably presented and argued. I have read and re-read the same with great interest, and have given this question considerable study and attention, but I cannot concur or agree with counsel's reasoning or conclusions. I am of the opinion that the apportionment act of 1907 is constitutional, and that the Hart-Agnew bill or bills received a constitutional majority of the lawful votes in the Senate on the 11th day of June, 1908, and is therefore in reality a valid and binding statute, and should be respected and obeyed. This conclusion or decision might be argued and written out at great length, but it seems to me unnecessary to do so while sitting at a criminal term of this court and before trial.

I am not called upon to decide or pass upon the second very interesting question raised by the learned gentlemen representing the defendants, to wit, "whether, if in law the said bills failed of passage, the Legislature's adoption of the compilation by the Board of Statutory Revision of the contents of the statute books gave existence as a statute to the 'Hart-Agnew Law,'" for the reason that I have already decided that the said bill or bills did not fail of passage, but did receive a constitutional majority of all the lawful votes in the Senate, and I therefore leave this interesting and very important question for the higher courts to determine.

The motions made by the defendants to dismiss all the indictments, and to inspect the minutes of the grand jury, are therefore denied, and the demurrers interposed to each indictment are overruled.

Let an order be entered accordingly.

---

### In re MILLS et al.

(Supreme Court, Appellate Division, First Department.   June 10, 1910.)

ASSIGNMENTS FOR BENEFIT OF CREDITORS (§ 178*)—COMPROMISE AND SETTLEMENT—CONCLUSIVENESS.

    Claimant having sold short 10,000 shares of stock through the assignors as stockbrokers, they borrowed the stock for delivery from H., paying him the market price therefor under an agreement that H., in case of a decrease in the value of the stock, should return an amount of the price equal to the difference in market value until the stock was returned. A marked decline in the stock occurred, and H., being unable to equalize the transaction, failed, and afterwards executed notes in question to the assignors representing the difference in the amount due. The assignors

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

were indebted to claimant in a large amount which was in dispute, one of the items disputed being $20,000 growing out of the borrowing of the stock, the assignors claiming that they acted in the transaction as claimant's agent and that the resulting loss was his. Thereafter claimant acquiesced in this contention, and notified the assignors that he would accept the borrowing transaction as his own and demanded the notes, but the assignors made an assignment for the benefit of creditors before the notes were delivered. *Held* that, whatever the relation of the parties under an ordinary short sale by brokers, the settlement transaction was valid, and entitled claimant to the notes as against the assignee and the assignor's creditors.

[Ed. Note.—For other cases, see Assignments for Benefit of Creditors, Cent. Dig. §§ 523, 525; Dec. Dig. § 178.*]

Ingraham, P. J., dissenting.

Appeal from Special Term, New York County.

In the matter of the assignment of S. Frederick Mills and others individually and as members of the firm of Mills Bros. & Co. to Edward Harding, assignee. From an order affirming a referee's report awarding certain notes payable to the assignors to Richard A. Canfield, the assignee and Adelaide T. Beach, a creditor, appeal.

See, also, 120 N. Y. Supp. 1136.

The opinion of Giegerich, J., at Special Term, is as follows:

The motion is for confirmation of the report of a referee and for a direction to the assignee for the benefit of creditors to turn over to the claimant certain notes in controversy. The claimant Canfield prior to the 22d day of August, 1907, was a customer of the firm of Mills Bros. &. Co., stockbrokers. In the course of his dealings with such firm he made a transaction known as "selling short" 10,000 shares of the stock of the Reading Railroad Company. The firm borrowed the stock from J. W. Henning, a member of the New York Stock Exchange, and delivered it to the persons to whom they had made the short sale on the claimant's order. In accordance with the custom obtaining in such cases, they paid to Henning the market price of the stock so borrowed, and received for the claimant's account from the purchasers of the stock the full purchase price thereof. According to the custom governing such transactions, if the stock increased in value, the firm, as borrowers, would pay to Henning, as lender, the amount of the increase; while, if the stock decreased in value, the lender would pay to the borrower the amount of such decrease, in order that at all times the loan should be kept as nearly as possible equal to the market price of the stock.

In the course of time there was a marked decline in the price of the stock, and the firm was unable to obtain from Henning the money he ought to have paid to equalize the transaction, as above outlined, and shortly afterward he failed, and ultimately the matter was adjusted in February, 1907, by his giving to the firm the three notes in question, each for $6,793.48. In the summer of 1907 the firm became financially embarrassed, apparently due largely, if not chiefly, to the question of the amount of its indebtedness to the claimant Canfield, the claim being made on his behalf that it owed him between $300,-000 and $400,000, only $91,000 of which was admitted by the firm. One of the items in dispute was this sum of approximately $20,000 growing out of the Henning transaction, the firm claiming that the transaction was one which it, as agent, made on behalf of Canfield, as principal, and that the resulting loss was his. Finally, in the summer of 1907, and a short time prior to the failure of the firm, which took place on August 22, 1907, Canfield acquiesced in the contention of the firm, and notified it that he would accept the transaction as his own, which would entitle him to receive the Henning notes which had been given in settlement. After the firm made an assignment, the assignee for the benefit of creditors refused to deliver the notes, and this proceeding was brought to determine Canfield's right thereto.

The conclusion I have reached is that the referee was right in finding that there was an agreement reached between Mills Bros. & Co. on the one hand and Canfield on the other, in August, 1907, that the latter should assume the loss in this Henning transaction, and should receive the Henning notes. Without referring further to the facts in the case, it is sufficient to say that a fair construction is to hold that the agreement with respect to this transaction was distinct and independent from the other and broader negotiations, that were in progress at the same time, and that it took effect and became binding on both sides notwithstanding the fact that the other negotiations did not result in an agreement and the firm was forced to make an assignment. This conclusion renders it unnecessary to consider what the result would be if there had not been any special agreement between the parties and their rights had to be determined upon the general relations which exist between customer and stockbroker in transactions of this character, which, it seems are very common, but which it is said in the briefs, have never yet led to any litigation adjudicating whether such a loss as was here sustained should be borne by the broker or the customer.

The motion is therefore granted, with $10 costs.

Argued before INGRAHAM, P. J., and McLAUGHLIN, LAUGHLIN, CLARKE, SCOTT, MILLER, and DOWLING, JJ.

Douglas Campbell, for appellants.
George Gordon Battle, for respondent.

PER CURIAM. Affirmed on opinion at Special Term.

INGRAHAM, P. J. (dissenting). The assignors were stockbrokers, members of the New York Stock Exchange, and doing business in the city of New York, and the plaintiff Canfield was a customer for whom the assignors were conducting various speculations in stocks and other securities. It seems that between September 17 and September 21, 1907, the assignors sold for the account of Canfield 20,000 shares of the stock of the Reading Railroad Company which were what was known as "short sales." The method by which such a speculation was carried out is as follows: These sales having been made, it became necessary for the assignors to procure the stock for delivery to the purchasers. To do that, they borrowed the stock from other brokers who were carrying such stock, and paid to such brokers the market value of the stock at the time it was borrowed under an arrangement by which the person borrowing the stock is bound to return the same amount of stock to the lender on demand, or the lender is bound to receive from the borrower an equal amount of stock at any time when tendered, and repay the borrower the amount paid, with interest at the agreed rate. To carry out this sale of the Reading stock, the assignors borrowed from one J. W. Henning, a member of the Stock Exchange, 10,000 shares of Reading stock, and paid to Henning the market price of the stock at the time it was borrowed. Subsequently, and on or about October 18, 1906, there was a sharp decline in Reading stock. Henning failed and did not make good the difference between the money paid to Henning by the assignors and the value to which the stock had declined. Immediately thereafter under the rules of the Stock Exchange, the assignors sold the said stock for account of Henning, which closed out the transaction as between the assignors and Henning, but left Henning indebted to the assignors in the sum of $88,854.61. Henning subsequently made various payments on account of this in-

debtedness, so that on February 1, 1907, he was indebted to the assignors in the sum of $19,419.37. On January 14th, Henning made an arrangement under which his remaining indebtedness to the assignors was liquidated by his delivering to them promissory notes for the amount due payable at various dates in the future, secured by a bond executed by a relative of Henning and the American Surety Company, and these notes and bonds were delivered to Mills Bros. & Co., and, in consequence of this arrangement, Henning was readmitted as a member of the Stock Exchange. The notes delivered by Henning to the assignors under this arrangement were three in number, each for $6,793.48, dated January 10, 1908, one payable on December 12, 1908, one on June 12, 1909, and one payable December 12, 1909, with interest from June 12, 1908, payable to the orders of the assignors, and were received by the assignors in settlement of Henning's indebtedness. On August 27, 1907, the assignors became insolvent and made an assignment to Edward Harding, as assignee, for the benefit of creditors, and these notes were delivered to the assignee as a part of the estate of the assignors. After this assignment was made, Canfield presented a claim to the assignee, claiming that these notes were his individual property, and that he was entitled to their possession. This claim was referred to a referee, who has reported in favor of the claimant, and upon that report an order was entered directing the assignee to deliver to Canfield the notes in question, or their proceeds which have since been collected by the assignee, and from that order the assignee appeals.

The determination of this appeal must depend upon the relation that existed between Canfield and the assignors. Canfield, desiring to sell Reading Railroad stock without having the stock to deliver, instructed the assignors as his brokers to sell the stock short. He had with the assignors sufficient margin to protect them against loss, and the assignors thereupon executed his order. From the nature of the transaction, the assignors undertook to obtain the stock to deliver to the purchaser so as to carry out the sale. There was no express agreement as to how this should be accomplished; but as to how that stock was to be obtained was not a matter in which Canfield was interested. If the plaintiffs had had a sufficient number of shares of stock in their possession at the time to make the delivery, they could have delivered it without borrowing the stock, or, if they had not, they were bound to borrow the stock to make the necessary delivery. It was the custom of the New York Stock Exchange that, in the absence of a special agreement as to these short sales, the brokers were entitled to any interest that was paid by the lender or the money that they had been paid when the stock was borrowed; the customer, however, being charged with any dividends that were paid on the stock while the short sales were outstanding. There was, however, a special agreement between the assignors and Canfield under which this interest was to be divided, Canfield to be credited on his account with one-half of the interest and the brokers to retain the other one-half. It is manifest that on such a short sale the rights of the parties are regulated by the contract between them, either express or implied from the nature of the transaction. It is true that the brokers are the agents of the customers

in making the sale, but in such a transaction, as no property is acquired by the broker on behalf of his principal, the obligation of the customer depends entirely upon the contract by which he undertakes to supply to the broker upon a demand a sufficient number of shares to make good his short sales. On the other hand, the broker undertakes that he will keep this transaction going on until such time as the broker demands from his customer a delivery of sufficient stock to complete the transaction, or gives orders to purchase the stock to close the speculation. A failure on the part of either to perform this contract would give a cause of action against the party who has committed a breach, but it is evident that under such a transaction no property is acquired by either the broker or his customer, and, in procuring the stock to enable the customer to carry out his contract, it would seem to follow that the broker does not act as the agent of the customer. With the details of the transaction the customer has no concern. Whether the stock is borrowed by the customer or not is quite immaterial to him. It is the broker's business to see to it that the person from whom he has borrowed the stock makes the necessary payment so as to keep the transaction between the lender and borrower at the market value of the stock. There is no distinction, as I can see, between a short sale of stock, or a sale of wool, or cotton, or other commodity; and, while there is a different method under the rules of the various exchanges at which these short sales are made, it seems to me that the general principle as to the relation of broker and customer must apply. In all cases of short sales made by a broker for a customer, the broker necessarily assumes the obligation of obtaining the stock or other commodities for delivery if immediate delivery is necessary. The details by which the transaction is carried out are assumed by the broker when he makes such a contract, and with such details or the obligation assumed by the broker in carrying out the transaction the customer has nothing to do. The relation that exists between a broker and his customer in carrying out such a transaction was discussed in White v. Smith, 54 N. Y. 522. In that case, it appeared that, the defendant having a sufficient margin on deposit, they were ordered to sell 300 shares of the New York Central Railroad stock. This order they filled, borrowing 300 shares of stock, and delivering it to the purchaser. Judge Earl, delivering the opinion of the court, in discussing the relation that existed between the broker and his customer, stated:

"By a sale of the stock the transaction was but half completed. Every short sale is made by the seller with the contemplation of covering it when the market shall have declined, and for the purpose of making a profit by the decline. I believe, in such case, until the stock is bought in and the short sale covered, the broker is said to carry his stock for his principal, and, while he carries it, he generally relies upon the margin placed in his hands as his security against loss by any advance in the market. I am of the opinion that when a broker agrees, for a commission to be paid to him, and upon the deposit with him of a margin agreed on, to make a short sale for a customer, it is part of the bargain that the broker shall carry the stock for a reasonable time, for in no other way can the object of the parties be effectuated. A short sale to be covered immediately, without waiting for any decline in the market, would be a very ideal transaction. The broker can, however, close the transaction at any time if the margin, upon his demand and notice, is not kept good; and, after he has carried the stock for a reasonable time, thus affording his customer an opportunity to realize his expectations, he may,

upon notice, close the transaction with his customer. * * * He is the agent of his customer, and must obey his orders both in making the sale and in covering it. If he acts without orders or against the orders of his principal he commits a breach of duty, and becomes liable, like any agent, for any loss he may thus occasion to his principal. * * * Neither is it any answer for the defendant to say that the plaintiff did not furnish them any money to make the purchase. The contract required them to furnish the funds. But, if it did not, what they realized when they made the short sale, together with the margin in their hands, was more than sufficient to enable them to buy stock to cover the sale. The very nature of the whole transaction was such that the plaintiff could not be required to advance any funds so long as he kept his margin good."

Campbell v. Wright, 118 N. Y. 594, 23 N. E. 914, presented a case of a short sale of wheat; and in discussing that case Judge Bradley, in delivering the opinion of the court, said:

"The relation of the defendants to the plaintiff was that of agency, and, so long as he performed his part of the contract, the adventure was subject to his control. But the brokers had assumed a responsibility in making the sale. They were responsible for the delivery of the wheat when due, or for the payment of the difference in price to the purchaser if it then became enhanced. And consequently the defendants had the right to protection from the plaintiff, whose duty it was to supply a suitable fund for margin to cover advances in price. * * * There were no special stipulations in the arrangements between the parties. Their rights were dependent upon the general principles applicable to such cases."

In Lazare v. Allen, 20 App. Div. 616, 47 N. Y. Supp. 340, which presented the case of a short sale of stock, the opinion was written by Judge Bradley, who wrote the opinion in the case of Campbell v. Wright, supra, and, in speaking of the relation between a broker and customer, it was said that:

"They [the brokers] by their relations to the business undertook to obey his orders in that respect if he kept them protected by a sufficient fund to adequately cover the margin. It was within the contemplation of the parties to the contract that if the plaintiff, upon reasonable notice, should fail to do so, the defendants would be at liberty to purchase on his own account for their own protection. * * * But, on the part of the defendant, it is claimed that the plaintiff was in default in not furnishing money to make good and take care of the short sale; that as a consequence they had on September 2d bought in the stock on the plaintiff's account at 56, which purchase left to his credit only $64.35, and that he was entitled to recover only that amount. The purchase was made without any order from the plaintiff, and, to support it as made on his account, it was essential to the defense that it be made to appear that there was occasion to call upon the plaintiff to make further deposit for the protection of the defendant, and that he failed to do so after having reasonable notice prior to the purchase to furnish the money. This was the implied provision of the contract pursuant to which the sale of the stock short made by the defendants was to be taken care of by them on the plaintiff's account, and for which they remained responsible until the short sale was covered by purchase."

The principle established by these decisions bases the liability of the broker and his customer and the obligations assumed by each upon the contract, express or implied, which exists between them. It is not a general agency by which the broker is authorized to do anything for the agent, because it has been expressly held that the broker cannot close out the transaction by purchasing the stock, no matter how insufficient the margin is to protect him without giving to the purchaser notice that additional margin was required, and this is based upon the na-

ture of the contract by which the broker undertakes to carry the transaction for a reasonable time to enable the purchaser to secure a profit. After the broker sells the stock, there then arises between the parties this implied contract which arises out of the very nature of the transaction and the object sought to be attained. One is that the broker should continue the short sale for a reasonable time to enable his customers to acquire a profit on the customer keeping the broker secured and the corresponding obligation on behalf of the customer to keep the broker secured. If the broker undertakes to keep the transaction outstanding, he necessarily undertakes to obtain the stock by which he can make a delivery to the purchaser, for in that way only can the transaction be continued. The custom between brokers under which stock is borrowed gives the broker the right of protecting himself against any fluctuation in the price by calling on the lender to furnish him with sufficient money to keep the stock at the market price. The broker is responsible for the solvency of the person with whom he deals, both in making purchases and sales of the stock and in procuring the stock to keep the contract open. The customer has no control over the broker with whom his broker deals, and it would seem to me to be inconsistent with the obligation of the parties, as between themselves, to hold the customer responsible for a failure of the broker to take the necessary steps to protect himself in his dealing with other brokers from which he procures stock to carry out his customers' orders. It might be that, if there was a settled custom among members of the Stock Exchange engaged in transactions of this character, the customer would be responsible for all loss by the brokers in carrying out his orders, and that, if a customer dealt with knowledge of such custom, such a custom would become a part of the contract, but the evidence in this case fails to show that such a custom existed, the weight of the evidence being that the brokers assumed the responsibility for the solvency of those with whom they dealt in carrying out these transactions. It certainly was not shown that the contrary custom existed so that a person making such a contract with his broker must be assumed to have acted in accordance with it; and the undisputed evidence is that the broker would be, in the absence of a specific agreement, entitled to any advantage that accrued in consequence of his relation with the other broker with whom he dealt in keeping the transaction open.

My conclusion, therefore, is that the obligation of the parties is covered by this contract, and that the broker undertakes to keep this transaction an open one until such time that his customer has failed after proper notice to supply a sufficient margin to indemnify the broker or has given orders to purchase the stock and close the operation.

There is a claim by Canfield that an agreement was made by which he was to assume this loss, and become entitled to the notes given by Henning to liquidate it; but I think the evidence fails to show any such agreement which would bind either party to it. After the assignors had failed, but before the assignment had been made, a question arose as between Canfield and the assignors in relation to the accounts between them. It would seem that then, for the first time, the plaintiff's assignors made a claim that Canfield should be responsible for his Henning loss, and that claim Canfield had at first disputed. The at-

torneys for the respective parties entered into negotiations to determine the amount due by Canfield to the plaintiff which was secured by certain stocks that the assignors were carrying for Canfield, and, finally; a proposition was made by Canfield's attorney that Canfield would take up the stocks that the assignors were carrying for him by paying to the assignors a sum of money, and, as a part of that offer Canfield's attorney said that Canfield would assume this Henning liability, he to be entitled to Henning's notes; that offer was never accepted and the transaction was never carried out, but remained as an offer by Canfield to accept Henning's loss as a part of an offer of settlement between Henning and the assignors. It must be quite apparent that, if Henning had failed to pay the notes on the basis of this proposition, the assignee could not have enforced as against Canfield the obligation for the Henning loss. The offer to accept the responsibility for Henning's deficiency was a part of the offer to settle the controversy between the parties which, having fallen through, would furnish no consideration for Canfield's promise to pay the Henning loss, or which would entitle Canfield to the Henning notes.

I am satisfied, therefore, that at the time the assignment was made Canfield was not responsible to the assignors for the Henning loss, and was not entitled to demand or receive from the assignors the Henning notes, and therefore that the order entered upon this report of the referee cannot be sustained.

It follows that the order appealed from should be reversed, with $10 costs and disbursements, and the claim dismissed, with costs.

LAUGHLIN, J. (concurring). I vote to affirm on the opinion at Special Term, which goes upon the theory that the minds of the parties met on the settlement agreement; but I fully concur in the views expressed by Presiding Justice INGRAHAM concerning the legal relation existing between a customer and a broker on short sale transactions.