(17 App. Div. 329.)

### DOUGLAS et al v. CARPENTER.

(Supreme Court, Appellate Division, First Department.   May 7, 1897.)

TROVER AND CONVERSION—WHAT CONSTITUTES CONVERSION.

It is a conversion for brokers to mingle securities deposited with them by a customer with other securities, and pledge them for loans for a greater amount than the customer's indebtedness to them, without retaining in their possession other securities of a like kind and amount.

Appeal from judgment on report of referee.

Action by John F. Douglas and Willard H. Jones, partners under the firm name of Douglas & Jones, against Robert B. Carpenter, for moneys advanced and services rendered in the purchase and sale of stocks. There was a judgment in favor of plaintiffs for $17,881.31, and defendant appeals. Reversed.

Argued before VAN BRUNT, P. J., and RUMSEY, WILLIAMS, PATTERSON, and PARKER, JJ.

Benjamin N. Cardozo, for appellant.
S. Hanford, for respondents.

WILLIAMS, J. The action was brought by a firm of bankers and stockbrokers, members of the Stock Exchange in New York City, to recover the balance of an account growing out of speculative stock, bond, and grain operations conducted by plaintiffs for defendant on margin. The account began October 11, 1888, and continued until December 1, 1893. The defendant, among other things, claimed that there had been conversion by the plaintiffs of certain securities belonging to the defendant by their having pledged the same, and that the defendant was entitled to damages for such conversion. There were other questions in the case, some of which have been argued before this court; but this is the important question, and the only one which we think it necessary to determine. We need not detail the facts to show how this question was raised. There is no dispute but it was in the case, was fairly raised, and the referee decided it in favor of the plaintiffs; and, if he was wrong, the judgment must be reversed. The question may be briefly stated as follows: Were the plaintiffs guilty of a conversion of the defendant's securities by pledging them for the benefit of the plaintiffs' own business, mingling them with other securities, and obtaining loans thereon for a greater amount than the indebtedness by the defendant to the plaintiffs on account thereof, and without retaining in the plaintiffs' possession other securities of a like kind and amount?

There are some things about which there is no dispute. The relations of pledgor and pledgee existed between the defendant and the plaintiffs. The securities were the property of the defendant, and the plaintiffs had a lien thereon for the amount of their advances. The unauthorized sale of the securities by the plaintiffs would have been a conversion thereof. An unauthorized loan of the securities by the plaintiffs, with the understanding that the persons borrowing them might sell or dispose of them according to their pleasure, would have been a conversion thereof. Such sale or loan would not have been consistent with the general ownership and ultimate rights of the defend-

ant. No custom, however general or long continued, could make such sale or loan legal, because it would be inconsistent with the contract between the parties, and in derogation of the property rights of the defendant. The defendant had the ownership of the securities, but not the right of possession. His interest in the property consisted in his right of redemption. By payment or tender of the indebtedness, the lien of the plaintiffs would have been discharged, and the defendant would have become entitled to the immediate restoration of his property. The plaintiffs might take title to the securities in their own name, and were not bound to retain or deliver the identical securities purchased for the defendant. Their duty was to keep on hand or under their control either the securities of the defendant, or a like kind and amount of securities, and to have them in such situation that the defendant, by paying the amount due by him thereon, could at any time obtain them. . This was what the plaintiffs agreed to do, and, so long as they did this, the fact that they used the securities while in their possession, awaiting redemption by the defendant, would not amount to a conversion thereof. These principles are well settled, and are recognized by both parties. See Markham v. Jaudon, 41 N. Y. 235; Baker v. Drake, 66 N. Y. 522; Grumann v. Smith, 81 N. Y. 28; Lawrence v. Maxwell, 53 N. Y. 19; Capron v. Thompson, 86 N. Y. 418; Taussig v. Hart, 58 N. Y. 429; Caswell v. Putnam, 120 N. Y. 153, 24 N. E. 287; Hopper v. Sage, 112 N. Y. 535, 20 N. E. 350; Horton v. Morgan, 19 N. Y. 170; Stewart v. Drake, 46 N. Y. 449–453; Levy v. Loeb, 85 N. Y. 365.

It would seem that the decision in Caswell v. Putnam, above, that the general rule that a sale or loan constitutes a conversion of securities, is to be regarded as modified to the extent that the sale or loan of the identical securities of the defendant will not be a conversion, provided the plaintiffs at all times keep in their possession or under their control securities of like kind and amount as those sold or loaned. In this case we must consider that the pledges were made by plaintiffs without keeping in their possession securities of a like kind and amount, because the defendant offered to make this proof, and the evidence was excluded. The pledges were therefore made of the defendant's securities, mixed and mingled with other securities, and for amounts larger than the indebtedness of the defendant to the plaintiffs, and no other securities of like kind and amount were kept in their place. The only question is therefore whether such pledges were conversions of the securities, as sales or loans of the securities would have been had the transactions been such sales or loans. It seems to us that all the reasons that operate to render sales or loans of the securities conversions are equally applicable to such pledges as were made by the plaintiffs of defendant's securities in this case. Any disposition of the defendant's securities by the plaintiffs which would deprive him of his right to immediate possession thereof, upon payment or tender of the indebtedness by him to the plaintiffs on account of such securities, would amount to a conversion thereof. A sale or loan would do this, no securities of a like kind and amount being kept in their place, because the securities would be gone, and could not be delivered to the defendant. It would not do to say that the plaintiffs might go into

the market, and buy other securities of a like kind and amount, on payment or tender being made by defendant, because the plaintiffs might not have the funds to purchase the new securities, and the only reliance the defendant would have would be the personal responsibility and ability of the plaintiffs, whereas he had a right to rely upon the securities themselves, and, if they were retained, he could get them, whether the plaintiffs were responsible or not.

As said by Rapallo, J., in Taussig v. Hart, above (page 430):

"To allow a broker to sell his customer's stock without authority, and speculate upon replacing it at a lower price, would be encouraging speculations by agents at the risk of their principals, totally inadmissible under familiar rules. Should the stock rise largely in price after the broker had thus devested himself of all control over the shares which he had purchased on the order of his principal, the broker might be unable to replace the shares, and the principal would have no remedy except a personal claim against the broker. This clearly is not what is contemplated under an agreement to buy and carry stocks. The customer does not rely upon an engagement of the broker to procure and furnish the shares when required, but upon his actually purchasing and holding the number of shares required, subject only to the payment of the purchase price."

It is not doubted but that the plaintiffs might lawfully have pledged the defendant's securities by themselves, separate and apart from others, for an amount not exceeding the indebtedness to them by the defendant thereon. In such case the defendant would have been protected, because he could have gone to the pledgees, and have obtained the securities by payment or tender of the amount of his indebtedness, and nothing more (Chapman v. Brooks, 31 N. Y. 75), but mingling them with other securities, and pledging them for an amount larger than the defendant's indebtedness, would have placed them where the defendant could not have obtained them by a payment or tender of the amount of his indebtedness, and would have been illegal and unauthorized (McNeil v. Bank, 46 N. Y. 325; Schouler, Bailm. p. 201). It will not do to say that plaintiffs might be able to get defendant's securities released from the pledges made by them, by paying up the whole or a part of the amount for which the pledges were made, and so be able to surrender them to defendant on payment or tender of the amount of his indebtedness. His doing this, like his purchasing other securities in the case of a sale or loan already referred to, would be dependent upon his having the funds to pay the amounts for which the pledges had been made, or his ability to get such securities released; and the same reasoning is applicable to pledges as would apply to sales or loans under like circumstances. The referee based his decision upon this point upon the consideration that "all the customer has a right to require is a delivery of his property on payment of the broker's lien thereon, and the proof before me is that the plaintiffs at all times had the control of the stocks and bonds bought and carried by them for the defendant, and were at all times able and ready to make delivery of them to the defendant on payment of the balance due on his account." If this statement were to be regarded as absolutely true, the judgment might be sustained upon such facts; but it must be remembered that the defendant offered to prove a different state of facts. The offer was to prove that instead of the securities being at all times under the control of

the plaintiffs, so that they were at all times able and ready to deliver the same to the defendant on payment of his indebtedness, the securities were mingled with other securities, and were pledged to third parties for amounts larger than the indebtedness by defendant to plaintiffs. This evidence was excluded. If it had been received and relied on, it would have appeared that the control of plaintiffs over the securities, and their ability to deliver the same to the defendant, would have rested, as we have before suggested, upon the personal ability of plaintiffs to discharge the amounts for which the pledges were made, or otherwise obtain possession of the securities. If such pledges had been made, and the plaintiffs had absconded or become entirely insolvent, the defendant would not have been able to get possession of his securities by merely paying the indebtedness thereon by himself to the plaintiffs. We are unable, in any view of the case, to see how the pledges of the defendant's securities could be said to have been legal. It seems to us that they were illegal, and were conversions of such securities. The conclusion we have arrived at upon this point requires a reversal of the judgment, and a new trial of the case. It is not necessary to consider the other questions raised on this appeal. The case is here determined largely upon the rejection of evidence offered, and when the defendant is permitted to give such evidence as he can, as to the nature and extent of the pledges alleged to have been made, the other questions arising in the case may need consideration.

The judgment appealed from should be reversed, and a new trial ordered before another referee, with costs to appellant to abide event.

VAN BRUNT, P. J., and RUMSEY and PARKER, JJ., concur.

PATTERSON, J. I concur in the conclusion at which the court has arrived respecting the rejection by the referee of evidence offered by the defendant, tending to show that the plaintiffs did not perform their full duty as brokers with reference to the bonds and stocks bought by them for the defendant; but I do not concur in the views expressed in the opinion of the court, nor in the inference to be drawn from them, respecting the general question of what constitutes a conversion by a broker of stocks and bonds bought by him on margins for a customer. In such transactions the broker is under no obligation to purchase or take title to shares in the name of his customer. He may buy and take title in his own name, and need not keep his customer's stock separated from his own. Horton v. Morgan, 19 N. Y. 170. He may even sell the shares he bought for his customer without being chargeable with a conversion (Caswell v. Putnam, 120 N. Y. 153, 24 N. E. 287), provided he keeps subject to the order of his principal an amount of stock of the same kind, equal to that purchased for his principal. The effect of these decisions is that the broker may use, in his own business, shares purchased on margin, and held by him for advances; and he is bound only to be ready, on demand, to give his customer his shares, or an equal number. He cannot, of course, purchase after a demand, and speculate on his customer's speculation; but he must always be in readiness with shares actually

available, in the course of business, for delivery, from the date of the execution of his customer's order. That does not curtail his right to use the shares in his business, and until demand is made. What is meant by the phrase "having always in his possession"? I do not understand it to be that he must have a certificate of shares in actual and continuous physical possession, but that he must have the shares always under his control, so that when, in due course of business, he is called upon, he can deliver, without going into the market to buy. He does not convert the stock of his customer simply by using it, in the ordinary way in which brokers conduct their business by borrowing money to carry all their customers' stocks, pledging and repledging even in bulk from time to time, according to the custom of their business, and as the necessities of their transactions may require, and to enable them to hold the shares, so long as they have shares under their control, and available, to perform their specific contracts with their customers when called upon to do so. But the offer of the defendant is broad enough even to cover this view of the broker's relation to his client. The words used in the offer are the same words employed by courts in speaking of the duty of brokers, and should be construed in the same way. I therefore concur in the reversal of the judgment.