(157 App. Div. 313.)

CARLISLE v. NORRIS et al.

(Supreme Court, Appellate Division, Second Department. June 6, 1913.)

1. CORPORATIONS (§ 125*)—ASSIGNMENT OF CERTIFICATE—"FLY-POWER."

 A "fly-power" is a written assignment in the form generally used on the reverse of stock certificates, which, when signed and attached to such certificate, is sufficient to transfer the same in like manner as an indorsement thereon.

 [Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 470–473, 477; Dec. Dig. § 125.*]

2. CORPORATIONS (§ 123*)—PLEDGE OF STOCK—RETURN OF STOCK.

 When stock is pledged by a customer with a broker, it is sufficient if the broker has in his possession, or under his control, an amount of such

stock equal to that hypothecated, which he can deliver to the customer when the account is closed.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 481, 491, 507–512, 537, 539–546, 569, 618; Dec. Dig. § 123.*]

3. PRINCIPAL AND AGENT (§ 108*)—TRANSACTION WITH AGENT—DELIVERY OF STOCK.

Where plaintiff gave to a broker certain stock certificates as security for his margin account, and gave to B., the broker's employé, the key to his safe deposit box, a formal written authority to deliver his securities to the broker, and to receive them back according to the state of the account, and also gave him blank powers to transfer the certificates, and did not himself go to the safe deposit box, the broker's return of a part of plaintiff's certificates to B. was a legal delivery to plaintiff.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. §§ 316, 317, 322; Dec. Dig. § 108.*]

4. CORPORATIONS (§ 123*)—PLEDGE OF STOCK—RETURN—IDENTITY OF STOCK.

Where stock certificates had been formally transferred to a stock broker, and stood in his name, and were indorsed by him when hypothecated to a bank as collateral security for a loan, the bank was under no obligation to return to it the identical certificates, but might discharge its obligation by returning any certificates of stock in the same company of like character, and for an equivalent number of shares.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 481, 491, 507–512, 537, 539–546, 569, 618; Dec. Dig. § 123.*]

5. PRINCIPAL AND AGENT (§ 108*)—AUTHORITY—STOCK CERTIFICATES—RETURN OF PLEDGE.

Defendant, a stockbroker, received as security for plaintiff's margin account two certificates of stock of 100 shares each, which had been formally transferred to him, and which he indorsed and hypothecated to a bank as collateral security for loans. Thereafter his employé, B., to whom plaintiff had given the key to his safe deposit box, with written authority to have access thereto, and powers in blank to transfer the certificates, left two additional certificates with defendant's cashier and on June 26th when the plaintiff's account permitted, received them back from the cashier, substituted them for those held by the bank, and which as against plaintiff defendant was entitled to hold until settlement of the account, and hypothecated them with another broker, receiving a check payable to defendant and credited by defendant on an account in which B. was interested, all without actual knowledge on the part of defendant. Afterwards B. sold the certificates hypothecated to his broker and retained the money. Defendant, after receiving the same two certificates from the bank, in October delivered them again to plaintiff. Held that, as plaintiff by the authority given B. had made it possible for the bank to acquire good title to such certificates, the defendant took the same title from the bank, and that its offer of delivery was a discharge of its obligation.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. §§ 316, 317, 322; Dec. Dig. § 108.*]

6. MONEY RECEIVED (§ 6*)—MONEY WRONGFULLY OBTAINED.

Money wrongfully obtained and received by another in good faith in the usual course of business and in partial liquidation of an actually existing indebtedness cannot be followed by the one from whom it has been obtained from the fraud of a third person.

[Ed. Note.—For other cases, see Money Received, Cent. Dig. §§ 15, 21–27; Dec. Dig. § 6.*]

Rich, J., dissenting.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Appeal from Trial Term, Kings County.

Action by Jay F. Carlisle against Alfred L. Norris and others. From a judgment for plaintiff, and from an order denying their motion for a new trial, defendants appeal. Reversed, and judgment directed for defendants upon the entire case.

Argued before JENKS, P. J., and BURR, THOMAS, RICH, and STAPLETON, JJ.

Harold Otis, of New York City, for appellants.

Isaac R. Oeland, of Brooklyn, for respondent.

BURR, J. When this case was before this court on a previous appeal, we decided upon the record then presented that the question of defendants' responsibility for the acts of George H. Brouwer, a person in their employ, was one of fact for the jury, as was also the sufficiency of an account stated between defendants and plaintiff. Carlisle v. Norris, 144 App. Div. 690, 129 N. Y. Supp. 585. Upon the retrial of the action both questions were submitted to the jury, and from a judgment entered upon a verdict in plaintiff's favor, and from an order denying a motion for a new trial, this appeal comes.

Upon the argument of the appeal, the defense of account stated was abandoned. The other question remains. Upon the present record we deem the following facts to be established by evidence introduced in behalf of plaintiff, or by uncontradicted and credible evidence introduced on behalf of defendants:

Defendants are surviving members of the firm of James H. Oliphant & Co., which was engaged in the business of stockbrokers. Said firm will hereinafter be referred to as the defendants. Plaintiff was also a stockbroker, trading upon margins. His transactions in the purchase and sale of stock were largely conducted through defendants. He had a desk in their offices, which might be deemed his business headquarters. At the time of the transactions here involved, Oliphant & Co. had in their employ one George H. Brouwer. Brouwer rendered assistance to the members of said firm in interviewing and corresponding with customers, at times notifying them of purchases and sales made on their account, and calling for additional margins when necessity required. His compensation consisted of a fixed salary, and in addition thereto a percentage reckoned on the profits of the business. He was not intrusted by the firm with the securities belonging to them. During business hours these were in the exclusive possession of the cashier of said firm, Donald D. Graham. At the close of each business day Graham accounted for all securities of defendants' firm to one of the members thereof, and delivered to him the securities then on hand, and he deposited them in a safe deposit box in the office of the Exchange, to which only members of the firm had access. At the opening of the succeeding business day one of the firm would in person procure these securities from said box and deliver them to the cashier for use in the conduct of the day's business. On June 28, 1906, and for more than a year prior thereto, plaintiff had kept his securities, other than those deposited with defendants to protect his margin account with them, in a safe deposit

box of his own. Neither defendant had control of or access to said box. Plaintiff had given to Brouwer formal written authority to have access thereto, and had given him the keys thereof. Plaintiff had also delivered to Brouwer certain instruments, executed by him in blank, known as "fly-powers."

[1] A fly-power is a written assignment in the form generally used on the reverse of stock certificates, which, when signed and attached to such certificate, is sufficient to transfer the same in like manner as an indorsement thereon. The circumstances under which these fly-powers were executed and delivered, authority given to Brouwer to have access to plaintiff's private safe deposit box, and the keys delivered to him, are thus stated by plaintiff:

"I had always kept my securities in Oliphant's hands—and I decided to take a vault in the New York Stock Exchange, which I did. He [Brouwer] knew I was taking it, and he said, 'Now'—I either was going on a vacation— this is a little mooted point; I do not quite remember this—I was either to be away for a day or two, or going on a vacation; he said to me, 'I think you had better give me a key to that box, because you are carrying a great many stocks in this office all the time, and a great many accounts, and they may need to be margined.' He said: 'Mr. Oliphant is a nervous man. If those accounts require margin, I can get them.' * * * I said: 'I think that is all right; all right, here is the key.' * * * Every certificate that I had in my box downstairs was in blank, nonnegotiable absolutely, and I was going away at one time, and I said: 'I have a lot of stocks, and I do not want those sold out.' He said, 'Well, you had better give me a blank power of attorney in case the accounts need margin I can use your stocks in the box, because they are in blank'—and I gave them to him; I think I gave him two or three."

It does not appear that defendants were advised of what occurred between Brouwer and plaintiff at the time when this authority was conferred upon him, nor that it was done at their request. The authority thus conferred upon Brouwer was not revoked until long after the circumstances out of which this controversy arose. During this period no one but plaintiff and Brouwer had access to said box, but on no occasion did plaintiff himself go to the same. During all the time he never looked in his box to see what securities were there. Every transaction which involved the necessity of access thereto was, in the words of plaintiff, "attended to for me by Brouwer." From February 15, 1906, until May 2, 1906, Oliphant & Co. held 900 shares of preferred stock of the American Tobacco Company, which plaintiff had deposited with them as security for his margin account. The certificates for this stock, with other securities, had been hypothecated by Oliphant & Co. with the National City Bank as security for loans made by the bank to them, and were subject to recall upon the deposit of other collateral. Two of these certificates were numbered, respectively, A9371 and A9372. All of the certificates had been formally transferred to Oliphant & Co., stood in their name, and had been indorsed by them when hypothecated. On May 2, 1906, two additional certificates of American Tobacco stock belonging to plaintiff came into the possession of Oliphant & Co. These two certificates were numbered, respectively, A9473 and A9564. These stood in plaintiff's name, but attached to each was one of the fly-powers executed by

plaintiff, hereinbefore referred to. This enabled the negotiation of these certificates by Oliphant & Co. in like manner as the other certificates which stood in their name, or by any other person into whose possession they might come, so long as the fly-powers were attached thereto.

These certificates came into defendants' possession under the following circumstances: On May 2, 1906, the margin of plaintiff's account with defendants' firm was low, and Brouwer handed these certificates with the fly-power attached, and also a certificate for 100 shares of stock of the National Biscuit Company, to Graham, defendants' cashier, with a statement that it was for the purpose of furnishing additional security for plaintiff's account. While Brouwer had authority in behalf of defendants to call for new margin when it was required, he also had from plaintiff both authority and the physical ability to deliver to them his securities when called for, and to receive them back again when no longer required. To quote plaintiff's words:

"During that period, from 1905, when I gave Brouwer access to my box, down to October, 1907, I never took any securities from my box and delivered them to Oliphant & Co., or received securities from Oliphant & Co. in person and deposited them in my safe deposit box. That was all attended to for me by Brouwer."

On June 26th of the same year, plaintiff's margin had so increased that this additional security was not required, and on that day, at Brouwer's request, Graham returned to him the certificate of stock of the National Biscuit Company, and also the two certificates of stock of the American Tobacco Company with the fly-powers attached, and Brouwer then stated that he was going to deposit the same in plaintiff's safe deposit box. Whether he actually did this does not appear, but on June 28, 1906, some one—it was not either of defendants or defendants' cashier, nor does it appear from direct evidence who it was—took these certificates to the National City Bank, which held, among other certificates that had been hypothecated by defendants as security for the loan by the bank to the firm, the two certificates for 100 shares each, numbered, respectively, A9371 and A9372, which had been deposited by plaintiff with Oliphant & Co. as security for his margin account in February, 1906, and which they were entitled to hold until plaintiff's account with them was settled. Brouwer was not authorized by defendants to make substitution of collateral for loans made by the bank to the firm, such substitution, like all other receipts and deliveries of securities, being made exclusively by Graham or by one of the members of the firm, but in some manner, which does not clearly appear, though presumably through Brouwer, an exchange was effected, the bank receiving the certificates A9473 and A9564 which had been returned to Brouwer as no longer necessary to secure plaintiff's account with Oliphant & Co., and instead thereof the bank delivered up the certificates A9371 and A9372, which, as between plaintiff and defendants, the latter were entitled to hold until plaintiff's account was finally settled. The evidence is that none of defendants knew anything about this substitution until long afterward. On June 28th, two days later, we find these certificates A9371

and A9372 in possession of Brouwer, who hypothecated them, as he was able to do by means of the fly-power above referred to, with W. B. Beekman & Co., another firm of stockbrokers, receiving in exchange therefor their check for $17,541.25. This check was at Brouwer's direction made payable to the order of Oliphant & Co., was delivered to them without any actual knowledge on their part as to the source thereof, and was by them credited at Brouwer's direction to an account carried upon their books and known as W. H. Bird's San Francisco account. This account was one in which Brouwer and Bird were jointly interested, and on that day there was a debit balance thereon of over $40,000. When the W. H. Bird San Francisco account was finally closed in October, 1907, after crediting it with the said sum of $17,541.25 paid as aforesaid, a debit balance still remained which was settled by the payment by Bird of a portion less than one-half thereof. In December, 1906, Brouwer caused the certificates A9371 and A9372, upon which on the preceding June 28 Beekman & Co. had advanced $17,541.25 to be absolutely sold, and the net proceeds thereof over and above the previous advance was $1,437. This money, so far as appears, Brouwer retained.

Brouwer's fraudulent transactions did not become known, either to plaintiff or to defendants, until October 3, 1907, when Brouwer told plaintiff that he had misappropriated 200 shares of American Tobacco stock, as well as other specific securities belonging to plaintiff, and also securities belonging to Oliphant & Co. Plaintiff brings this action alleging that on June 28, 1906, he was the owner of 200 shares of the preferred stock of the American Tobacco Company, of the value of $17,547.50, which were held in pledge by the firm of James H. Oliphant & Co. to secure a loan made by them to plaintiff, that said loan has since been paid, and that on said date these shares were sold by defendants or their representatives to W. B. Beekman & Co. for $17,547.50. A demand by plaintiff for the payment of such sum, and a refusal on the part of the defendants, were also alleged and admitted. Upon this complaint and the facts above set forth, is plaintiff entitled to his judgment?

[2] It is true that on the 26th day of June plaintiff was the owner of 200 shares of American Tobacco stock, represented by certificates numbered A9371 and A9372, and that Oliphant & Co. held these certificates in pledge, and that neither these particular certificates nor the proceeds of the sale of these particular certificates were returned to him when his margin account with defendants was settled. But that alone does not establish defendants' liability. Identity of certificates is not essential. When stock is pledged by a customer with a broker, it is sufficient if the latter has in his possession or under his control an amount of the stock in question equal to that hypothecated, which he can deliver to the customer when the account is closed. Caswell v. Putnam, 120 N. Y. 153, 24 N. E. 287; Douglas v. Carpenter, 17 App. Div. 329, 45 N. Y. Supp. 219; Strickland v. Nagoun, 119 App. Div. 113, 104 N. Y. Supp. 425, affirmed 190 N. Y. 545, 83 N. E. 1132. The vital question in this case, therefore, is, Did plaintiff receive from defendants all of the American Tobacco Company stock, or the pro-

ceeds of the sale of such stock, to which he was entitled? That he received all of the 900 shares hereinbefore referred to, which was not represented by either of the certificates specified, is conceded. Concretely, therefore, the question may be stated in this way: Between February 15, 1906, and June 26, 1906, defendants received from plaintiff four certificates, each for 100 shares of the stock of the American Tobacco Company. Now many shares of said stock did said defendants return to him?

[3] On June 26th they returned to him two certificates for 100 shares each. That the physical delivery was to Brouwer does not alter the fact that the legal delivery was to plaintiff. Not only a long course of conduct between the parties, but the affirmative evidence of plaintiff, above quoted, establishes that Brouwer received these certificates of stock from defendants' cashier, not in the discharge of any duty which he owed defendants, but under express authority from plaintiff, and whatever duty he then owed with respect to the care and preservation of such stock he owed to plaintiff. If he had on that day taken these certificates, and, with the assistance of the fly-powers furnished to him by plaintiff, sold this stock and used the proceeds for his individual purpose, there can be no question that the loss would have been plaintiff's, and not defendants'.

[4, 5] In October, 1907, when the account between plaintiff and the firm of Oliphant & Co. was finally closed, it delivered to plaintiff personally two certificates of said stock for a like amount. Unless this delivery was only an apparent and not a real one, defendants' obligation was completely discharged. They had received 400 shares; they had returned 400 shares. Plaintiff contends that the latter delivery is an apparent, and not a real, one, and that defendants are twice seeking credit for delivery of the same amount of stock. It is true that defendants are seeking credit for delivery of the same certificates of stock on two different occasions, but this is not necessarily synonymous with delivery of the "the same amount of stock." As we have before pointed out, identity of certificates is of no consequence. The same certificate of stock might be used on a dozen different occasions to make a dozen different valid deliveries, if in the interval between each delivery such certificate legally came into the possession of the person making such delivery. On June 26th defendants delivered to plaintiff certificates numbered A9473 and A9564, and in October, 1907, it delivered to him two certificates bearing the same numbers. Whether thereby a good delivery was made of 200 or 400 shares of the stock in question depends upon how these identical certificates came back into the possession of Oliphant & Co. between June 26, 1906, and October, 1907. When Oliphant & Co. deposited 200 shares of American Tobacco stock, represented by certificates numbered A9371 and A9372, with the National City Bank, as collateral security for its loan to said firm, the bank was under no obligation to return to it these identical certificates, nor could defendants insist that it should. It discharged its obligation when it returned to them any two certificates of stock in the same company of like character and for an equivalent number of shares. If defendants,

therefore, had observed that two of the certificates returned to them did not bear the same registry numbers as those deposited with them, it would have had no legal significance.

The most favorable construction of the evidence for plaintiff is that the change at the National City Bank by the substitution of certificates numbered A9473 and A9564 for certificates numbered A9371 and A9372 was effected by Brouwer. But in bringing about this change the positive and uncontradicted evidence is that he had no express authority from defendants to make such substitution, and there is not a particle of evidence that by any course of dealing with the bank he had been held out by said firm as possessing such authority. It may be urged, also, that plaintiff had not given to Brouwer any express authority to make use of his securities, except from time to time to deposit them with Oliphant & Co. to make good his margin. But he had given Brouwer physical possession of his securities, and the power to make these securities negotiable. As plaintiff testified, speaking of Brouwer:

"There was no other man alive in this country, or any other, to whom I intrusted such power. It is a fact that when those fly transfers signed by me in blank were attached, for instance, to 100 shares of sugar preferred, standing in my name, that then the certificate with that attached to it, if properly executed, could be negotiated. * * *

"Q. And you knew when you did that, that Brouwer would have the power to take your securities and place them anywhere, did you not? A. Absolutely, if there was an open execution he could do anything.

"Q. You knew that Brouwer with those certificates, with that power attached, could go to Langharr (one of the firm of W. B. Beekman & Co.) and negotiate a loan? A. He could have done that. * * *

"Q. You knew he could take your securities and go anywhere with those fly powers, and sell them or borrow on them, did you not? A. Yes; because I trusted him implicitly."

In effect, then, to a person dealing with him without notice of his express authority, Brouwer was an agent of plaintiff with unlimited power. If before the loan from the National City Bank to Oliphant & Co. had been paid off, and while certificates A9473 and A9564, delivered to it by Brouwer, were still in its possession, plaintiff had sued said bank to recover possession of said certificates or the value thereof, is there any question that he would have failed? He had made it possible for Brouwer to transfer a good title to these certificates of stock to any one dealing with him, without express notice of the limitation upon his authority. In effect, Brouwer sold certificates numbered A9473 and A9564 to the bank for a valuable consideration, except that such consideration was paid not in money, but by certificates numbered A9371 and A9372. The bank acquired a perfectly good title to certificates numbered A9473 and A9564. When it delivered these certificates to Oliphant & Co., at the time when its loan to them was paid, said firm acquired an equally good title to the stock which it could use in settlement of its obligations with plaintiff. To illustrate it in another way: Suppose that on June 26th Brouwer had taken certificates numbered A9473 and A9564 to the National City Bank, and sold them for cash. Suppose that the next day the price of American Tobacco stock had greatly advanced, and the bank

had concluded to sell 200 shares of the stock under its control, and had done so, but in making deliveries under the sale had handed the purchaser certificates numbered A9371 and A9372, and when Oliphant & Co. had paid its loan to the bank, it had delivered to such firm certificates numbered A9473 and A9564. Can there be any question that Oliphant & Co. acquired such title to the stock that it could use these very certificates to liquidate its obligations to plaintiff or to any one else? The details of this transaction and the transaction under consideration may differ; the principle is the same.

[6] The fact that Oliphant & Co. received the check which Brouwer obtained from Beekman when he hypothecated with them certificates numbered A9473 and A9564 does not alter the relation of the parties. This money was received by defendants in good faith, in the usual course of business, in partial liquidation of an actually existing indebtedness, and without notice of the fraudulent methods through which such money had been obtained. It cannot be pursued into their hands by one from whom it has been obtained through the fraud of a third person. Nassau Bank v. National Bank of Newburgh, 159 N. Y. 456, 54 N. E. 66; Ball v. Shepard, 202 N. Y. 247, 95 N. E. 719.

It follows, therefore, that the motion made by defendants at the close of the entire case to direct a verdict for defendants should have been granted. The conclusion which we have reached upon this question makes it unnecessary to consider any of the exceptions with respect to rulings upon evidence, or in connection with the charge or requests to charge.

The judgment and order denying a motion for a new trial should be reversed, and judgment directed for defendants upon the entire case, with costs of the action and of this appeal.

JENKS, P. J., and THOMAS and STAPLETON, JJ., concur. RICH, J., dissents.