## COOK v. FLAGG.

(Circuit Court of Appeals, Second Circuit. January 16, 1918.)

No. 156.

1. TRUSTS ⚖95—CONSTRUCTIVE TRUST—FRAUDULENT REPRESENTATIONS.

Representations made by one holding himself out to customers as a stockbroker, doing business according to the custom of brokers and by the usual methods of dealing on the exchange, *held* fraudulent, and to impress in the money and property in his hands received from them a constructive trust in their favor, where it was shown that he was not a member of any exchange, but did business as a customer through other brokers, and that his method of doing business was such that he did not have at any time in his possession or under his control the stock to deliver to a purchasing customer or the money to pay a selling customer, arising out of his transactions for such customer, but that they could only rely on his personal solvency.

2. CUSTOMS AND USAGES ⚖8—ILLEGALITY.

A custom is illegal which allows a broker to match the opposite orders of two customers, and not keep on hand the proper securities.

Appeal from the District Court of the United States for the Southern District of New York.

Suit in equity by Elsworth E. Cook against Jared Flagg. From the decree, defendant appeals. Affirmed.

See, also, 233 Fed. 713.

Appeal from a decree in a suit in equity. The jurisdiction of the District Court was based on diversity of citizenship. The decree appointed a permanent receiver, directed him to take possession of certain property in the possession of the defendant on the 23d day of September, 1911, and in general

to distribute the same to the persons entitled thereto in accordance with the claims of the complaint.

The suit was instituted on behalf of the plaintiff and all others similarly situated against the defendant, who had done business as a stockbroker in the city of New York up to the 23d day of September, 1911. The equity of the complaint was based upon the allegations that the plaintiff (and the same allegations applied in general to the other customers of the defendant) had paid to the defendant between March 9, 1910, and August 14, 1911, $10,000 in cash to be used for investment in the purchase and sale of stocks in the city of New York; that the defendant had obtained this money upon certain representations made as to his method of doing business. These representations were false. The defendant never did business in accordance with them, nor intended so to do. The money was received on a trust ex maleficio, and the remaining assets in the hands of the defendant at the termination of his business were impressed with such trust on behalf of all his customers which a court of equity would recognize. The specific allegations of fraud in the complaint are that the defendant represented that he was conducting a genuine brokerage business in buying and selling standard stocks on his customers' orders, and that each transaction represented a bona fide purchase and sale of stocks, while in fact the defendant did not conduct such a business, and did not actually buy and sell any stocks, but merely went through the form of making purchases and sales through the medium of brokers upon stock exchanges; that when the defendant, who was himself not a member of any stock exchange, received an order to sell stock, he gave a corresponding order to buy the same amount, so that each offset the other; that therefore no stock was actually bought or sold for any customer, and the purchases and sales were a fiction and pretense on the defendant's part.

The contract executed by all customers with the defendant, in substance, was as follows: That the defendant should purchase for the account and risk of the customer at the market price a given number of specified stocks; that he should repeat the purchase of the same number of shares of such stocks as their price declined one point or more and as often as any purchase showed a profit of one point or more that he should sell the same, and that this should be repeated as often as possible. Similarly the contract provided that the defendant should sell for the account and risk of the customer a specified number of shares of specified stocks, and, if these stocks went up a point or more, that he should sell the same number of shares, and should buy back these shares when they showed a profit of one point or more, and that this should be repeated as often as possible; that the profits should be paid to the customer irrespective of unclosed paper profits or unclosed paper losses up to 50 per cent. per annum on closed transactions. It was likewise agreed that the defendant was not a member of any exchange, but was to do business through recognized brokers upon some such exchange. The defendant in each case gave a receipt for margin deposited by the customer "to protect" the defendant "from loss in any transaction." This receipt provided that the defendant might close out all the transactions if the margin should not be sufficient. The defendant was authorized to lend all securities according to the usages of the New York and Consolidated Stock Exchanges and to pledge them on his loans.

The facts shown upon the trial were substantially as follows: The defendant had an office in the city of New York, and solicited business as a stockbroker, though he was not a member of any exchange. His plan was to buy and sell stocks through brokers upon the stock exchanges in 10-share lots. By refusing to close out any transaction which showed a loss, and by closing out those which showed a gain, the defendant asserted that in the end the balances were sure to show a profit, whether the transaction was a "short" sale or a "long" purchase. The customers in most instances were to buy or sell some proportion of 10-share lots of various stocks, generally not the whole 10 shares themselves, and were to be credited with their proportion of the profits on all closed transactions up to 50 per cent. of their investment each year, while the open transactions were supposed to offset each other, together with the profits on closed transactions above the amount necessary to pay the

customer the 50 per cent. of earnings which he must get. The defendant, on receiving an order from a customer for the purchase of a fractional part of a unit of 10 shares of a given stock, would enter it upon his books as part of a purchase or sale of a unit of 10 shares, and would actually made in each case a proper contract through some stock exchange broker. The proper proportion of this sale he would enter in his books opposite to that customer, and when he closed out the transaction, it would be by making a corresponding sale or purchase for a unit, which he would parcel out among his customers in the same way, making the proper entries in his books. He followed the plan of holding open transactions which showed a loss and closing only those which showed a profit.

As the defendant repeatedly made sales and purchases of units upon the same day through the same broker of the same stocks, the result of his transactions was generally that he did not have, either in his possession or in the possession of his brokers, shares of stock equal in amount to those which his customers had bought or sold. Thus, if he bought a unit of 10 shares of a stock and the same day sold a unit of 10 shares, the broker through whom he did it would not have any shares of stock corresponding to both these transactions, because, as between the defendant and the broker, the transaction would have "washed" or been set off. At the close of his business, therefore, in September, 1911, he could not fulfill his commitments; that is to say, if his customers had paid him at that time the balance due upon stocks purchased by them, he would have had to go into the market and make new purchases of those stocks, and, if they had sold stocks short, he would not have had the purchase price of such stocks if they had delivered to him the stocks themselves to return the shares borrowed upon the short sale.

The District Judge concluded that, in representing himself as a broker engaged in making purchases and sales of stocks, defendant represented himself as having within his control stocks sufficient to deliver to his customers, upon payment of the purchase price, and credits, sufficient to pay them on return by them of stocks borrowed by him upon their short sales. He concluded, therefore, that the representations under which the defendant had done business were fraudulent, and that all the money received was impressed with a constructive trust. As the assets seized by the temporary receiver and the subject-matter of this suit were concededly assets which had come from customers under transactions of a similar sort, he held that all these were all impressed with the constructive trust which a court of equity would recognize.

Philip C. Samuels, of New York City, for appellant.

Gilbert E. Roe, of New York City (John M. Scoble, of New York City, of counsel), for appellee.

Before ROGERS, Circuit Judge, and LEARNED HAND and MAYER, District Judges.

LEARNED HAND, District Judge (after stating the facts as above). [1] The case depends upon whether the defendant, by representing that he did business as a broker through stock exchange brokers, committed fraud in the way he actually conducted such business; especially whether his right to lend securities according to the usages of the New York and Consolidated Stock Exchanges allowed him to buy and sell on his own account without having on hand the necessary securities to fulfill his commitments at any time. As a preliminary it is necessary to analyze the effect of transactions made by a broker in the execution of speculative orders for his customers.

If a broker, A., receives an order from his customer, B., to purchase 100 shares of stock, he goes upon the exchange and at once makes a contract of purchase which entitles him on the next day to call

upon the selling broker, C., to deliver the necessary certificate of that stock. During the same day he may, however, have an order to sell 100 shares of the same stock for D., another customer, and he will execute a similar contract, requiring the payment from the buying broker E., of the purchase price on the following day. When the broker's obligations are stated at the end of the day, he will therefore be called upon to pay for the stock bought for B., and to deliver the stock sold for D., and he will be entitled to call for the stock bought for B., and for the purchase price of the stock sold for D. If all the transactions were carried out, he would therefore receive the stock from the selling broker, C., and deliver it to the buying broker E.; he would receive the purchase price from the buying broker, E., and pay it to the selling broker, C. If the purchase and sale were at the same figure, therefore, the performance of his contracts would result in no more than C.'s delivery of the stock to E., and E.'s payment to C. This is just what the "clearing" of the transactions ordinarily effects in the Clearing House. Thus it would appear that A. would have received no stock to deliver, if B. demanded delivery, and no purchase price to pay D., if D. presented his certificate. Nevertheless, this is not the whole of the transaction, because D. must deliver his certificate to A., when he gives the order or within 24 hours afterwards, and that certificate when delivered is at once available to B., and indeed becomes ipso facto his property. Gorman v. Littlefield, 229 U. S. 19, 33 Sup. Ct. 690, 57 L. Ed. 1047. Now, as soon as A. gets D.'s certificate, he has the right, as pledgee of B., to pledge it to the extent of B.'s debt to him, and the proceeds of this pledge, together with B.'s margin, are available to pay D. the purchase price of his sold stock. Thus, although A. gets nothing from his contracts of purchase and sale on the stock exchange, at the end he has 100 shares of the stock to answer B.'s purchase, and that stock is not incumbered by more than the unpaid balance of the purchase price.

If D. was a "short" seller, and therefore had no stock to deliver, A. proceeds precisely as before, and makes a contract of purchase from C. and of sale to E., and these contracts will be cleared as before, so that C. delivers to E., and E. pays C. However, as D. has no stock to deliver, A. would have no stock for B. and no cash for D. at the end of the day if the transaction stopped there, but it does not, or at least it should not. A. should borrow from F., another broker, 100 shares of the stock at the time of making the "short" sale for D. This certificate he will not need on the next day to make delivery under his "short" sale because it has been canceled, but he should get it within his control, or he will have no stock to deliver under B.'s purchase, and his "short" sale will not be a real sale at all. Of course, A. must secure F. for the stock which he borrows from him, and this he does by giving him a check for the present purchase price of the stock, with an additional sum to serve as margin in case of its advance in value.

In such a posture both customers are protected. If B. first wishes to get his stock, he may do so by paying his debt to A. A. having originally received B.'s margin, and now the debt being paid to him,

can deliver the stock to B., being himself made whole by B.'s margin and his payment of his debt to A. If D. thereafter demands the original purchase price and his margin, he may get it from A. by tendering the stock which A. may deliver to F. and receive in payment the purchase price and D.'s margin, both of which F. was holding as security. On the other hand, if D. first wishes to get his original purchase price and his margin, he will tender to A. his stock, which A. will hold for B. at once, will return to D. his margin, and he can raise upon the stock which D. delivers the amount of B.'s debt to him, and pay both this amount and B.'s margin to D., together amounting to the purchase price to which D. is entitled. If thereafter B. wishes his stock, he can have it by paying his debt to A., who will have no claims upon it but the amount of B.'s debt, which he has raised by pledging it to pay D. A. may settle with F. by allowing him to keep the security.

All this assumes that A. in each transaction represents one customer in each bargain on the exchange, but a very different result arises if he does not. We must in this case suppose that A. does not execute the orders himself or through another broker, G., acting as his agent, who deals in his name, but that he becomes a customer upon the books of G. If he then attempts to execute through G. a "short" sale for D., and a "long" order for B., G. will of course not take the stock which he has borrowed upon D.'s "short" sale, for he does not need it. Regarding A., as he does, as trading altogether upon his own account, his purchases and sales will clear each other upon G.'s books, as they will be cleared in the Clearing House. G. need have, and indeed should have, no stock on hand at any time for A.; he will pay him only the differences in the sale prices. Thus A., by concealing the fact that he is acting as a broker for others, modifies their rights materially. If they call upon A. for their securities in the event of his insolvency, he would be totally unable to perform. He would have neither securities in his hands, nor would he even have the right to call upon others by valid contracts to deliver the securities. He must go out and by new contracts put himself in possession of the property which he represents himself as having purchased for his principals.

The defendant always figured merely as a customer with the exchange brokers through whom he dealt. In buying a unit of 10 shares and selling the same he paid no attention whatever to keeping available with the broker the necessary securities. Obviously it would have been impossible to do so, unless he was prepared to require his brokers to keep separate accounts with each customer or at least with each group of customers aggregated into a unit. He did operate through some 11 brokers for his 800 customers, and in some cases he doubtless sold stock for one unit through one broker and bought the same stock for another customer through another broker. In those cases he would have the proper securities available for each, but in an enormous number of instances he bought and sold the same stock through the same broker, and in these he necessarily had nothing to show but the differences, figuring himself, as he did, only as customer.

[2] The rules governing such transactions have been worked out in

the courts of New York with precision,[1] and they were accepted by the Supreme Court in Richardson v. Shaw, 209 U. S. 365, 28 Sup. Ct. 512, 52 L. Ed. 835, 14 Ann. Cas. 981. The broker is an agent to buy, with the rights of a pledgee upon stock on which he has had to advance part of the purchase price. He must proceed as pledgee, and must have within his control enough securities to fulfill his commitments whenever he is called on to produce them. Re McIntyre & Co., 174 Fed. 627, 98 C. C. A. 381; Re Brown, 185 Fed. 766, 107 C. C. A. 656. The only open question seems to be whether he may pledge the securities generally, or only to the extent of his own lien (Strickland v. Magoun, 119 App. Div. 113, 104 N. Y. Supp. 425; Mayer v. Monzo, 151 App. Div. 866, 137 N. Y. Supp. 616), a question not material in this case, and probably covered in any event by the defendant's contract. We may assume for the purposes of this case that the defendant under that contract had the right to lend his customers' securities as his interest dictated, though that is not wholly clear. It is clear, however, that under these rules the broker has no right to set off the purchase of one customer against the sale of another, leaving nothing in his hands to answer either, and being obliged actually to execute the orders only if called on to do so. If the practice of clearing through the Stock Exchange Clearing House effects this, it changes the relation absolutely between him and his customer, as laid down in the courts of New York. It is said, however, that the custom of brokers permits just this, and that the defendant's reservation of a right to lend securities under such a custom justifies his conduct of his business in the way he conducted it.

The testimony of the stock brokers called by the defendant seems to refer to methods of business not in accordance with what we deem to be lawful practice. We cannot be sure that some of the witnesses altogether understood the questions, though it must be conceded that in parts anyway of their testimony they seem to say that it is their custom, to match a "long" purchase against a "short" sale, under an exercise of the right sometimes given brokers to lend out the "long" customer's stock. It is upon this somewhat problematical custom that the defendant relies. Whether it exists or not, it certainly can have no justification in the right to lend customer's securities. To return to the illustration given above: It is suggested that when the Clearing House cancels B.'s contract of purchase by D.'s contract of sale, it is the same thing as though B. had received his stock, had lent it to D. and D. had sold it. This is all a fiction. B. had not the right to receive the stock at the time of delivery, because under the rules of the Clearing House, it had been canceled. It is idle to speak of his stock being lent to D. A. has borrowed no stock for D., because he has not needed it. It is true that A. has a right to call on D. to return the stock and on B. to pay the purchase price, but only in case he fails to keep his margin

[1] Horton v. Morgan, 19 N. Y. 170, 75 Am. Dec. 311; Markham v. Jaudon, 41 N. Y. 235; Stewart v. Drake, 46 N. Y. 451; Baker v. Drake, 66 N. Y. 518, 23 Am. Rep. 80; Gruman v. Smith, 81 N. Y. 25; Caswell v. Putnam, 120 N. Y. 153, 24 N. E. 287; Minor v. Beveridge, 141 N. Y. 399, 36 N. E. 404, 38 Am. St. Rep. 804; Content v. Banner, 184 N. Y. 121, 76 N. E. 913, 6 Ann. Cas. 106.

good. That is involved in A.'s contract with each. If, then, B. may not call upon D. through A. to return the stock, how can it be said to be a loan? Certainly it is not B.'s understanding that he lends his stock at the pleasure of the borrower.

It is strenuously urged, however, that the result to the parties is the same as though A. had the securities in his control, in the sense in which that phrase is used in Douglas v. Carpenter, 17 App. Div. 329, 45 N. Y. Supp. 219; that is to say, in the sense that he had either possession of the necessary securities or cash, or some outstanding contract with a specific person under which he could require their delivery or payment. Let us examine this contention. In the first place the defendant charged interest upon his "long" customers' accounts, and presumably charged his "short" customers with dividends. In the case of such matched orders he neither paid interest for the one nor dividends for the other and he was not bound to pay any. There can be no debate that such charges were fraudulent, no matter what custom may countenance them.

Again, though, if A. remains solvent till both B. and D. close out their contracts, the result is the same whether A. has actually received and held the stock or not, it is not the same if he becomes insolvent. If the orders have been matched, B. and D. have nothing but claims against A. along with his general creditors. If the orders have been truly executed, A. will have stock for B. and security in the hands of F. for D. Thus B. will be able to get his stock by paying for it, either from the possession of A. (Gorman v. Littlefield, 229 U. S. 19, 33 Sup. Ct. 690, 57 L. Ed. 1047) or from his bank if A. has pledged it, as is almost universally the case. Even if the rule in Mayer v. Monzo, 151 App. Div. 866, 137 N. Y. Supp. 616, applies (though it is very doubtful whether it does, Douglas v. Carpenter, 17 App. Div. 329, 45 N. Y. Supp. 219), B. will have some equity, since the bank never lends the full value of the securities. B. and other customers have the right to trace their property into the equity, and the records of this court are full of such cases.

It may be urged that A. may have lent the stock, in which case the security which he receives upon the loan will be mingled in his assets. In the first place, it is not impossible, at least theoretically, that B. should be able to trace the security among A.'s assets, in which case he would claim it. Moreover, if it should so happen that the borrower upon A.'s insolvency closed out the loan with a profit, it would inure to B.'s account, since it was his stock that was lent. While such a contingency is indeed unlikely, as the security is generally kept very closely equal to the value of the stock lent, it is not impossible in the case of property which like stocks has such fluctuating values.

Similarly of D., the "short" customer, he has the right to adopt the borrowing made in his behalf, and if F. should close out the loan at a less price than the security left in his hands, D. could claim any balance of the security remaining.

The point in respect of each customer is that he has some property rights which he may assert, if the orders have in fact been executed and are not merely obligations against his broker. The law has always in-

sisted that he is entitled to such rights, and if the broker, having held himself out as such, conducts his business in a fundamentally different way, the customer may disaffirm the relation and reclaim what he has delivered to him. Nothing can conceal the fact that any such custom as that relied upon strikes at the very root of the relation and makes the broker, not an agent to buy and sell, but to make contracts to buy and sell, a very different thing. We are not concerned with the latitude of his powers over his customers' securities; we may assume for the purposes of this case that he may substitute them for others of like kind; that he may even pledge them without limit, or that he may lend them upon proper security. But some securities there must be in some other sense than his ability to go into the market and buy from the general mass of securities when his customer makes a demand.

The precise question has been twice so ruled in Massachusetts, Fiske v. Doucette, 206 Mass. 275, 92 N. E. 455; Green v. Corey, 210 Mass. 536, 547, 548, 97 N. E. 70. In that state a statute (R. L. c. 99, § 4) makes it a defense to the customer's recovery of his margins if the broker "makes * * * an actual purchase or sale." These cases hold that, when a Boston correspondent employed a New York broker to do exactly what the defendant's brokers did here, the Boston correspondent did not "make an actual purchase or sale," and the customer could recover.

The same case also arose in Katz v. Nast, 187 Fed. 529, 109 C. C. A. 295, where the Circuit Court of Appeals for the Seventh Circuit ruled that, where the broker did business through an exchange broker, he must keep within his control securities necessary to fill their claims. In that case, a part of the purchase had been set off by the exchange broker because of sales made the same day by the out of town broker. It was held that to that extent the out of town broker had not executed the order.

Des Jardins v. Hotchkin, 142 App. Div. 845, 127 N. Y. Supp. 504, condemns the practice, though the facts are not quite parallel. Yet the only ground for opening the account stated was that the broker at best had executed his orders through another who had the right to set off any claims of his own against the broker's account. That was not so strong a case as this.

Decree affirmed, with costs.