No. 46,803

CHARLES C. THEIS, *Appellee*, v. DUPONT, GLORE FORGAN INCORPO-
RATED, *Appellant*.

(510 P. 2d 1212)

Opinion filed June 9, 1973.

*Benjamin C. Langel,* of Foulston, Siefkin, Powers & Eberhardt, of Wichita, argued the cause, and *Robert C. Foulston,* of the same firm, was with him on the brief for the appellant.

*Terry O'Keefe,* of Kidwell, O'Keefe & Williamson, Chartered, of Wichita, argued the cause, and *Martha R. Hodges,* of the same firm, was with him on the brief for the appellee.

The opinion of the court was delivered by

FROMME, J.: The defendant duPont, Glore Forgan Incorporated (duPont) appeals from a judgment for damages of $11,100.00 entered in favor of plaintiff Charles C. Theis (Theis) in a trial to the court. The damages were occasioned by an unauthorized transaction by an employee of duPont in the commodities market on the Theis investment account. On appeal duPont does not challenge the trial court's findings of fact but questions the conclusions drawn therefrom.

Theis opened an account with duPont, a brokerage firm, in August, 1967, for the purpose of trading in the commodities market. The account was opened through Craig Benjamin, an employee of duPont who handles such accounts and who is referred to as an account executive. Benjamin handled the Theis account from its inception. The commodity transactions in question involved trading in "pork bellies" on a July, 1968, futures market. Pork bellies are bought and sold on the commodity market in contracts of 30,000 pounds and are used to produce bacon.

Generally if an investor believes the market price of the commodity will rise, he purchases contracts at the current market price and holds them to sell when the market price has risen. This is referred to in the trade as "taking a long position". If the investor believes the market price of the commodity will decline, he sells a number of contracts which he does not own but agrees to purchase on or before a set date in the future. This is called "taking a short position".

Under the rules of the New York Stock Exchange, which govern the business operations of its members and their employees, an account executive such as Benjamin is prohibited from exercising discretionary powers over individual commodity accounts. Trading must be on express written authorization from the customer. The policy and procedures manual of duPont prohibits its account exec-

utives from accepting or exercising discretionary powers over commodity accounts. However, in practice these rules were not strictly complied with by employees of duPont.

During the entire period Theis traded through duPont no written authorization was obtained. The record indicates Theis gave Benjamin no discretion as to initiating a long or a short position on the market but Benjamin was given limited authority to decide the time for a sale or purchase once a position had been taken. Two to five days after each trade Theis received a written confirmation on each particular transaction. Over a nine month period several hundred transactions took place in the Theis commodity account.

Theis was a seasoned trader who had first traded in the commodities market in the 1930's. Theis and Benjamin held different investment philosophies. Theis preferred to seek profits by holding a position for a considerable time. Benjamin preferred to seek profits from more frequent trading which naturally resulted in the payment of more commissions. Almost from the beginning Theis discovered that Benjamin was making unauthorized transactions in his account. Theis reprimanded Benjamin and threatened to close the account but did not complain to Benjamin's superiors. On March 11, 1968, plaintiff wrote Benjamin insisting that Benjamin make trades pursuant to directions only. Nevertheless the unauthorized trading continued. In April, 1968, Theis ordered Benjamin to stay on the short side but Benjamin disregarded the order and bought in the contracts. In early May when Theis learned of this he told Benjamin to get back on the short side and said this was a final warning. Benjamin thereafter made unauthorized long trades on May 16 and 17.

The denouement came on May 24. When the market opened that morning Theis' position was short ten pork belly contracts, a position he had held since May 17. The market was dropping rapidly. Benjamin wanted to buy the contracts in for a quick profit, but Theis personally ordered Benjamin to keep his position intact. Later that same day, disregarding these orders, Benjamin bought in the contracts at a price of 33.65 cents per pound. Theis arrived at Benjamin's office and learned of the purchase made in direct contravention of his previous orders. His patience gave out, he went home, called duPont's cashier and demanded his account be closed immediately. This occurred on the same day as the unauthorized purchase of May 24. Before the account actually was closed Benjamin made two additional trades in the account on May 29 but

these are not concerned in this action for duPont took the loss on the May 29 trades. Theis did not receive a check for the balance in his account until June 3, 1968. On June 3, the price of pork bellies on the July market had fallen to a low of 29.95 cents per pound. If Benjamin had followed orders on May 24 and had maintained Treis' position in the market (short ten pork bellies), on June 3, Theis could have closed out his account with an additional profit of $11,100.00.

Theis filed suit claiming $80,000.00 damages for all unauthorized trading by Benjamin in the Theis account from its inception. The trial court disallowed the claim as to all transactions prior to May 24, and entered judgment based upon the May 24 unauthorized transaction. Theis does not cross appeal from the denial of recovery for the other transactions. There is no appeal by duPont from the denial of its third party claim against a son of Theis. The questions raised are therefore limited and directed toward the judgment based on the May 24 transaction.

The appellant duPont presents three questions in an effort to overturn the judgment, (1) ratification, (2) implied or apparent authority and (3) failure to mitigate the damages.

Ratification is the adoption or confirmation by a principal of an act performed on his behalf by an agent which act was performed without authority. The ratification by the principal of an unauthorized act of his agent is equivalent to an original grant of authority. On acquiring knowledge of the unauthorized act of an agent, the principal should promptly repudiate the act, otherwise it will be presumed he has ratified and affirmed the act. (*Adrian v. Elmer*, 178 Kan. 242, 284 P. 2d 599.)

In *Hartwell v. Manufacturing Co.*, 78 Kan. 259, 97 Pac. 432, it is said:

"It is trite law that where one, without authority, assumes to act as the agent of another in making a contract, the principal must repudiate the transaction within a reasonable time after all the material facts in regard thereto have come to his knowledge or he will be presumed to have ratified the contract. . . ." (p. 263)

(See also *Isaacs v. Motor Co.*, 108 Kan. 17, 193 Pac. 1081, and *Will v. Hughes*, 172 Kan. 45, 238 P. 2d 478.)

The principles governing ratification, including the requirement of prompt repudiation of an unauthorized act of an agent, are applicable in brokerage transactions. (*Lord v. Jackman*, 206 Kan.

22, 476 P. 2d 596; 12 Am. Jur. 2d, Brokers, § 68, p. 822; 12 C. J. S., Brokers, § 44, p. 106.)

In its brief duPont contends the trial court correctly applied the foregoing principles to defeat the greater part of the claim, but erred in failing to apply such principles to bar recovery for the transactions between April 26 and May 24.

The record is clear the trial court correctly applied these principles to this entire period. During this period of time there were 36 transactions in the Theis account. The court determined that by Theis' failure to promptly repudiate unauthorized transactions he had either authorized or ratified the first 35 transactions. However, the court found that Theis promptly repudiated the final transaction of May 24 when he learned it had been made contrary to his express orders. This was evidenced not only by registering a protest with Benjamin but also by closing his commodities account with the broker.

It is pointed out the requirement of prompt repudiation is to prevent an investor from withholding his disapproval until the market has taken a turn for the worse, and then deciding to assert the alleged wrongdoing. In such case if prompt repudiation were not required he might sit back and quietly accept profits resulting from an unauthorized trade when it turned out to be to his advantage.

In the present case Theis had previously absorbed the losses, as well as the gains, resulting from Benjamin's unauthorized transactions. However, on May 24 Theis did not hesitate in closing his account as soon as he learned that Benjamin had bought in his short position contrary to express instructions. The record shows he did so without waiting to see whether the market price would ultimately rise or fall. His actions indicate he was unconcerned with the wisdom of the May 24 purchase. He was irate over the unauthorized purchase by Benjamin. The action of Theis in closing his account with duPont was found by the trial court to be an express repudiation of the May 24 transaction and this finding is supported by substantial evidence. Whether there has been a repudiation within a reasonable time is a question of fact (*Halloway v. Milling Co.*, 77 Kan. 76, Syl. ¶ 2, 93 Pac. 577) and the ratification of a former unauthorized act is not the ratification of another entirely distinct act. (*Patterson v. Lynch, Inc.*, 266 N. C. 489, 146 S. E. 2d 390; 3 Am. Jur. 2d, Agency, § 181, p. 567.)

duPont's second contention is that Benjamin had implied or apparent authority to exercise discretion in the Theis account and thus had authority to make the disputed transaction.

The law recognizes two distinct types of agencies, one actual and the other ostensible or apparent. The authority of an actual agent may be either express or implied. The distinctions between express, implied and apparent authority are explained in *Greep v. Bruns*, 160 Kan. 48, 159 P. 2d 803, as follows:

"The authority of an actual agent may be either express or implied. It is express if the one sought to be charged has delegated authority to the agent by words which expressly and directly authorize him to do a delegable act. It is implied if from statements of the parties, their conduct and other relevant circumstances it appears the intent of the parties was to create a relationship permitting the assumption of authority by an agent which when exercised by him would normally and naturally lead others to believe in and rely on his acts as those of the principal.

"An ostensible or apparent agent is one whom the principal has intentionally or by want of ordinary care induced and permitted third persons to believe to be his agent even though no authority, either express or implied, has been conferred upon him." (Syl. ¶¶ 4 and 5)

These distinctions have been frequently articulated by this court. See *Carver v. Farmers & Bankers Broadcasting Corp.*, 162 Kan. 663, 179 P. 2d 195; *Shugar v. Antrim*, 177 Kan. 70, 276 P. 2d 372; *Rodgers v. Arapahoe Pipe Line Co.*, 185 Kan. 424, 431, 345 P. 2d 702.

duPont can find no solace in either the apparent authority or implied authority principles. The *Greep* case makes it clear the apparent authority doctrine has relevance only when a third party has dealt with an ostensible agent and then seeks to bind the principal to a transaction despite the fact that the agent had no actual authority to bind him. (See generally 2A C. J. S., Agency § 158, p. 791, and cases cited in 4 Hatcher's Kansas Digest [Rev. Ed.], Principal and Agent, § 13.) Here, no third party is involved. duPont's brokerage contract was with Theis, though made through Benjamin as the account executive. duPont, as Benjamin's employer, does not occupy the position of a stranger or third party to the agency contract. It did not enter into any purchase or sale with plaintiff based upon any apparent authority in Benjamin.

Likewise, there can be no implied authority to make the May 24 purchase. The trial court found that Benjamin was under express instructions not to make the purchase. The relation existing between a principal and agent is a fiduciary one demanding

conditions of trust and confidence and requires of the agent the same obligation of individual service and loyalty as is imposed upon a trustee. (*Merchant v. Foreman,* 182 Kan. 550, 322 P. 2d 740.) It is the duty of an agent to obey all reasonable instructions and directions in regard to the service he has contracted to perform and to adhere faithfully to them in all cases where they ought properly to be applied. (3 Am. Jur. 2d, Agency, § 206, p. 585.) Where the instructions are clear, precise and imperative, they should be followed strictly and exactly, and a violation of definite instructions cannot be excused by a custom or usage in the business and makes the agent liable for loss resulting therefrom. (*Marchant v. Foreman,* supra; *Insurance Co. v. Bigger,* 105 Kan. 311, 182 Pac. 184; 3 C. J. S., Agency, § 147, p. 29; Restatement, Second, Agency, § 383, p. 187; 12 Am. Jur. 2d, Brokers, § 121, p. 867.) Here, Theis' express directions for Benjamin not to make the purchase on May 24 precludes a finding that Benjamin had implied authority to do so. (See Restatement, Second, Agency, § 33, Comment [a] and [b].)

Defendant's final point is that the damage award did not reflect plaintiff's failure to mitigate his damages.

Our cases have frequently stated that one who is damaged by breach of contract is under a *duty* to minimize or mitigate his damages where he can do so by the exercise of reasonable diligence. See, *e. g., Swisher v. Beckett,* 172 Kan. 711, 242 P. 2d 831; *Cain v. Grosshans & Petersen, Inc.,* 196 Kan. 497, 413 P. 2d 98; *In re Estate of Stannard,* 179 Kan. 394, 295 P. 2d 610. The use of the term "duty" is criticized by the text writers. See 5 Corbin on Contracts, § 1039; 11 Williston on Contracts, § 1353. The rule, more properly stated, is simply that damages are not recoverable for harm that the plaintiff should have foreseen and could have avoided by reasonable effort without undue risk, expense or humiliation. Restatement, Contracts, § 336. Comment *d* to the Restatement section explains why the term "duty" should not be employed:

"It is not infrequently said that it is the 'duty' of the injured party to mitigate damages so far as that can be done by reasonable effort on his part. Since his legal position is in no way affected by his failure to make this effort, however, it is not desirable to say that he is under a 'duty.' His remedy will be exactly the same, whether he makes the effort and avoids harm or not. But if he fails to make the reasonable effort with the result that his harm is greater than it would otherwise have been, he cannot get judgment for the amount of this avoidable and unnecessary increase. The law does not penalize his inaction; it merely does nothing to compensate him for the harm that a reasonable man in his place would have avoided." (p. 537)

The use of the term duty has also been criticized occasionally in our own cases without lasting impact. See *Rock v. Vandine*, 106 Kan. 588, 189 Pac. 157; *Griffin v. Oklahoma Natural Gas Corp.*, 132 Kan. 843, 847, 297 Pac. 662, 81 A. L. R. 274. A party rests under a disability to claim damages which he might have prevented.

duPont contends Theis failed to minimize damages by failing to act on May 2, after learning Benjamin had made more unauthorized transactions. Defendent then computes damages based on market prices between April 29 and May 3, and comes up with the sum of $3,518.00 as the proper award. The trouble with defendant's argument is that the trial court awarded no damages at all for transactions during that period. Those transactions were held to have been wholly ratified. The award was based upon the single unauthorized transaction of May 24. Upon learning of the unauthorized purchase May 24, plaintiff had over $10,000.00 in his account balance. He did not receive that money from defendant until June 3. He testified and the trial court found he lacked sufficient cash assets during the May 24 to June 3 period to re-enter the market with another brokerage firm in an effort to minimize his loss. The award of damages measured by the lowest price in the May 24 to June 3 interim appears reasonable. (See Anno. 63 A. L. R. 305; 12 Am. Jur. 2d, Brokers, § 130, p. 872.)

In 12 Am. Jur. 2d, Brokers, § 116, p. 863, it is said:

"Where a broker buys stock to cover a short sale, without authority to do so, and the principal repudiates the purchase and orders a purchase later at a lower price, it has been held that the measure of damages is the difference between the amount paid on the unauthorized purchase and that which would have been realized if the purchase had been made at the direction of the customer, or, if no order to purchase was given within a reasonable time, the lowest market price within a reasonable time after notice to the principal that the 'covering' purchase was made."

Plaintiff could not minimize his loss without the funds in defendant's control. Plaintiff conceded he might have stopped his losses by going to another account executive of defendant during the period from May 24 to June 3. In 5 Corbin on Contracts, § 1043, p. 272, the majority rule is recognized that "it is not necessary for the plaintiff to make another contract with the defendant who has repudiated, even though he offers terms that would result in avoiding loss."

In *Cain v. Grosshans & Petersen, Inc.*, supra, the court said:

"We are not prepared to say that an injured party may never be obligated to minimize his loss by entertaining a subsequent and less favorable offer from

the breaching party, although the majority rule in this country appears to be that an innocent party is not required to execute a less advantageous contract with one who has already welshed on his agreement. [Citations omitted.]" (196 Kan. p. 502)

In *Cain* the court held there was no requirement to deal with the repudiator under the facts of the case. Since the broker-client relationship must involve mutual trust and confidence and since it was defendant's employee who disobeyed his order and caused his loss, it would be unreasonable to require plaintiff to continue dealing with defendant to minimize loss. There was no one at defendant's office that plaintiff trusted after May 24.

Plaintiff Theis made an immediate demand for his account balance and expected it on the next business day. Had it not been for further unauthorized trading on the closed account by Benjamin, the internal confusion at the duPont office caused by such trading and the failure to promptly close the account as directed, plaintiff could reasonably have expected to receive the account balance within a day or two of closing his account. Losses are not regarded as avoidable if the defendant prevents plaintiff from taking the steps necessary to avoid them. (5 Corbin on Contracts, § 1039, pp. 250-251, citing *Rull v. Rainey*, 99 Kan. 57, 160 Pac. 1016.) The trial court correctly held that plaintiff was not restricted in his recovery of damages by failure to mitigate the damages.

The judgment is affirmed.