(638 P.2d 359)
No. 52,701

SHEARSON HAYDEN STONE, INC., *Appellant,* v. JOHN P. PERRIER, *Appellee.*

Opinion filed December 17, 1981.

*David J. Rebein* and *Jack E. Dalton,* of Mangan, Dalton & Trenkle, of Dodge City, for appellant.

*James A. Williams,* of Williams, Larson, Voss, Strobel & Estes, of Dodge City, for appellee.

Before JUSTICE MILLER, presiding, REES, J., and STEVEN P. FLOOD, District Judge, assigned.

REES, J.: Plaintiff is a brokerage firm. On behalf of its customers, it engages in commodities futures trading on various ex-

changes of which it is a member. Defendant was a customer of plaintiff's. Plaintiff brought this action for the balance claimed to be due and owing on defendant's account. Defendant asserted a counterclaim for damages to which he claimed entitlement in the event recovery was granted on plaintiff's claim. Following bench trial, the trial judge denied recovery by either party. Plaintiff appeals.

The parties' extensive elucidation of the essentially undisputed facts and of mechanics, purposes and considerations involved in commodities futures trading, have afforded us some enlightenment. These matters need not be reiterated beyond the observations hereafter made. We believe our expression of these observations is sufficiently correct and accurate but we acknowledge probable technical inaccuracy in various instances. (A brief recitation of definition of terms and mechanics of futures trading appears in Smith, *Commodity Futures Trading,* 25 Drake L. Rev. 1, 57-59 [1975]; and in *Cook v. Flagg,* 251 Fed. 5 [2nd Cir. 1918], is a descriptive analysis of transactions by a broker in execution of orders for his customers.)

No contracts for the future delivery of feeder cattle were entered into by and between the parties. The primary relationship between the parties was that of principal (defendant) and agent (plaintiff). (See *Matter of Mills,* 139 App. Div. 54, 59-62, 123 N.Y.S. 671 [1910], for a discussion of duties of broker and customer in short position.) The "Commodity Customer Agreement" is an agency agreement reciting plaintiff's agreement to act as defendant's agent for the purchase and sale of "contracts" for the future delivery of commodities and delineating certain of the parties' rights and duties. Interestingly, the agreement includes no expressed provision for compensation to plaintiff for its services. Thorough as it may be, the "Commodity Customer Agreement" clearly leaves much unsaid. The extent to which the agreement is properly fleshed out by custom, practice, unstated understanding of the parties, and rules and regulations of regulatory agencies and the Chicago Mercantile Exchange, is not clear in the record.

By his written statement signed and delivered contemporaneously with the "Commodity Customer Agreement," defendant declared his transactions were to be hedge transactions, not speculative investment transactions.

The April 28, May 3 and May 4 "sales" of the twenty contracts for delivery of feeder cattle the following August, September, October and November, were all authorized by defendant. The contracts represented a total commitment to deliver 840,000 pounds of feeder cattle at an average price of $58.775/cwt. Thus, when defendant took his short position he "entered the market" on contracts sold for a total "consideration" of $493,710.

The initial margin requirement was $20,000 ($1,000 per contract). At the close of business on May 4, the margin (original and maintenance, or initial and variation) requirement was $27,904. The extremity of the leveraging and risk involved in commodities futures trading is disclosed when it is seen that the $20,000 defendant needed to advance when plaintiff put him in the market is only 4.051% of the $493,710. (This disregards maintenance margin attributable to market rise from April 28 to May 4.) Similarly, his $27,904 margin, or security, requirement at the close of business on May 4 was but 5.563% of the then $501,614 total market price for twenty like August, September, October and November feeder cattle contracts.

When plaintiff took defendant out of the market on Friday, May 5, it had received no margin payment from defendant. Defendant's checks received by plaintiff on Monday, May 8, were dishonored by defendant's bank upon his stop payment order. Plaintiff has never had in its custody any funds or assets of defendant's, other than the cover contracts "bought" on May 5, available for margin or for credit against his account.

The twenty contracts bought by plaintiff to cover defendant's contracts "sold short" were bought at an average price of $60.205/cwt. Thus, defendant was taken out of the market and his account was "closed out" through transactions representing $505,722 "paid" for 840,000 pounds of feeder cattle to be received in the same quantities and on the same dates fixed for delivery under the twenty contracts sold by plaintiff for defendant. The result was a $12,012 loss on the transactions and in defendant's account when plaintiff covered defendant's short position. ($505,722 - $493,710 = $12,012.)

Although not addressed in the record, commodities futures trading is handled by brokerage firms and exchanges on a book entry basis. There are no certificates or documents exchanged.

As it has before us, plaintiff strenuously argued to the trial

judge that it did not wrongfully cover. Its argument is that it was authorized to cover without notice for two reasons provided for by the "Commodity Customer Agreement." One asserted reason is that plaintiff could cover because defendant was required to put up margin and plaintiff's receipt of margin was at defendant's risk. The other reason propounded is that it could cover at any time that in its sole and unfettered discretion it considered cover necessary for its protection. (Plaintiff was required to personally and continuously maintain with the exchange a margin equivalent to that required by plaintiff of its customer. The margin payment by plaintiff to the exchange was effected by drawing against plaintiff's deposit at the exchange. Through this procedure, plaintiff personally secured performance of the contracts it sold on behalf of defendant.)

As to plaintiff's first urged reason, defendant's position is that plaintiff's receipt of margin payment transmitted by defendant within a reasonable time after plaintiff's demand was at plaintiff's risk. To plaintiff's argument on its second reason, defendant responds that the facts do not support a conclusion that plaintiff reasonably considered cover necessary for its protection.

The trial judge's findings of fact are clear, supported by the evidence and not challenged. There is less clarity in the conclusions of law.

The sum and substance of this lawsuit may be simply put. Plaintiff seeks recovery of defendant's account balance—a debt. (See *Pistell, Deans & Co., Inc. v. Obletz,* 232 App. Div. 313, 316, 249 N.Y.S. 616 [1931].) Defendant claims plaintiff wrongfully covered. Defendant further argues that if plaintiff wrongfully covered, one of two results must follow—either plaintiff cannot recover the account balance, or if plaintiff is granted recovery then defendant is entitled to recover damages resulting from plaintiff's wrongful cover.

For our resolution of this appeal, we will assume without deciding that defendant made timely remittance of margin payment, that plaintiff bore the risk of nonreceipt of margin payment, and that plaintiff's cover of the short sales made on behalf of defendant was not within the contractual authorization to cover "whenever in your discretion you consider it necessary for your protection." The result is that we assume plaintiff wrongfully purchased to cover defendant's short position. The question then

becomes: What is the proper resolution of the parties' resulting rights and obligations as a matter of law? The trial judge, ostensibly treating the case as rescission by plaintiff, denied recovery to either party.

Little appellate case law is found concerning a broker's wrongful cover of a customer's short position. Even less is found concerning wrongful cover in commodities futures trading. Still less is found concerning wrongful cover of a customer's short position in commodities futures trading. In the latter situations, substantial resort is made to stock trading law by analogy. This approach is logical and proper. It may be a view of involved parties, the bench, and the bar, that the law is well settled, fair and just that accounts for the scarcity of appellate case law.

An eminently fair and the apparently prevailing measure of damages rule for a broker's conversion of stock—a rule applied to a broker's wrongful sale of stock bought on margin on behalf of its customer and held by the broker subject to resale or delivery upon the customer's order—is the difference obtained upon subtraction of (1) the price realized upon conversion from (2) the highest market price between (a) the time the customer has notice of the conversion and (b) a reasonable time thereafter for the customer to decide whether to go into the market to replace the stock. If the facts are not in dispute, the mentioned reasonable time is a question of law. *Minor v. Beveridge,* 141 N.Y. 399, 403, 36 N.E. 404 (1894); *Colt v. Owens et al.,* 90 N.Y. 368 (1882); Annot., 31 A.L.R.3d 1286, 1305-1334.

It perhaps is of worth to make some comments regarding the foregoing rule.

Application of the rule is most easily comprehended where there is a rising market following the conversion. For example, if the customer is put in the market in a long position—that is, stock is purchased for the customer's account—at $10, the broker sells at $15 without authorization, and the highest market price within a reasonable time after conversion is $25, the broker holds $5 ($15 minus $10) for the account of and subject to disbursement to the customer on his demand, and the broker has an additional $10 liability to the customer for the conversion ($25 minus $15). The customer is made whole as if he had ordered sale at $25; he had the opportunity to stay in the market longer if he had wished, but at his risk.

In *Theis v. duPont, Glore Forgan Inc.,* 212 Kan. 301, 308, 510 P.2d 1212 (1973), a commodities futures short position case, reference is made to the 12 Am. Jur. 2d, Brokers § 116, p. 863, expression of the rule as applied to a short position situation. However, the measure of damages issue raised by the broker in *Theis* was founded upon the contention that the customer failed to mitigate and it was mitigation that the Supreme Court addressed, discussed and resolved.

The customer in *Theis* was unable to reenter the market. In the case before us, at all times material on and after May 5, defendant was able to stay in or reenter the market. Furthermore, he had "contact with the futures market by radio, television or direct contact with the commodities office eight or ten times a day."

*Theis* and this case, both short position cases, are the converse of the hypothetical case posed above. The customer going short "profits" in a falling market and "loses" in a rising market. In this case, according to the record before us, the market rose for at least a month after May 8. The date of maximum loss during this month was May 23. If defendant had closed out on that date, his loss would have been $64,202. In fact, defendant's position could not have been liquidated at any time during the month following May 8 at a loss less than the $12,012. Defendant argues that if plaintiff had not closed out his account he could have "made" $32,592 (less $1,000 in commissions). This presupposes liquidation on June 23. It is equally reasonable to speculate (using that word advisedly) that if defendant had reentered the market in a short position on May 23—fifteen days after defendant learned of plaintiff's wrongful cover—he would have "made" $96,794 (less $1,000 in commissions). To give a customer who is the "victim" of a broker's wrongful closeout a free ride such as proposed by defendant is patently harsh to the broker (see 31 A.L.R.3d at 1322-1323), unreasonable, and would lead to grossly inequitable results.

A qualification to the "conversion damages rule" we have described permits the customer to opt out of application of the rule by claiming the market value at the time of conversion. This affords an investor who is in a long position protection from the consequence of a post-conversion falling market and an investor who is in a short position protection from the consequence of a post-conversion rising market. See 31 A.L.R.3d at 1323.

We discern no good reason to reject application of the described stock conversion damages rule to commodities futures trading. As alluded to in *Theis,* the rule logically and appropriately applies to sales (short position) as well as purchases (long position) in commodities futures trading. This is true despite the fact no true conversion occurs. Accordingly, we hold it correct to say the measure of damages rule for a broker's unauthorized and wrongful purchase to cover its customer's short position in commodities futures trading is the difference obtained upon subtraction of (1) the lowest market price between (a) the time the customer has notice of the covering purchase and (b) a reasonable time thereafter for the customer to decide whether to go into the market to renew, or reinstate, his short position, from (2) the price paid to cover. *Raisis v. Eisele & King, Libaire, Stout & Co.,* 20 App.Div.2d 392, 394, 246 N.Y.S.2d 942 (1964).

We conclude without hesitation that the reasonable time following the notice of wrongful cover in this case (May 8) was not more than thirty days. Defendant sustained no damage as a result of plaintiff's wrongful cover of defendant's short position — at no time during that thirty days were the relevant feeder cattle futures prices less than the cover prices paid.

According to defendant's theory, the theory supporting utilization of commodities futures trading for hedging, he was in a no-lose situation—when the futures market price was above the price at which he entered, his commodities futures market loss was theoretically offset by an increase in the value of his cattle on the cash market; if on the delivery date called for under the contracts he sold, the value of his cattle on the cash market was less than the price at which he entered the commodities futures market, defendant would not suffer the cash market price diminution because the "purchaser" of the contracts he sold was committed to accept delivery and pay the price called for by those contracts. This reasoning gives rise to the statement that defendant was "locked in" at the price obtained for the contracts sold on his behalf.

Bemoaning that he got nothing out of his contract other than a headache and a lawsuit, defendant argues there was failure of consideration due him under the "Commodity Customer Agreement." This argument rings hollow. Plaintiff agreed to buy and sell futures contracts on behalf of defendant in consideration for

at least the implied promise of defendant to pay commissions, Plaintiff sold and bought for defendant's account. This is not a failure of consideration case. *Roberts v. Anderson,* 254 S.W. 723, 725-726 (Mo. App. 1923), is authority for the conclusions that plaintiff did not rescind and defendant is not entitled to judicial rescission. Defendant's claim is for breach of contract, or, some might say, breach of duty owed defendant arising out of the parties' relationship. However, and as we have said, the result of application of the aforementioned measure of damages rule to the facts of this case is that defendant sustained no recoverable damages—the market price was above the cover price throughout the thirty days (reasonable time) following the date of defendant's receipt of notice of plaintiff's cover purchases. See *Jones v. National Chautauqua County Bank,* 272 App. Div. 521, 528-529, 74 N.Y.S.2d 498 (1947).

Does plaintiff's wrongful cover extinguish its claim and prevent recovery from defendant? We hold it does not.

By the "Commodity Customer Agreement" defendant expressly promised "I . . . will pay on demand any amount owing with respect to any of my accounts."

"[W]here a stock broker [wrongfully] sells . . . stock purchased by him for a customer, on a margin, and held in pledge to secure the advance made by him for the purchase, he does not thereby, as a matter of law, extinguish all claim against the customer for the advance, but the customer is entitled to be allowed . . . damages . . . ." *Minor v. Beveridge,* 141 N.Y. at 403.

"The settled rule in New York is that a broker's claim for the recovery of a customer's indebtedness is not extinguished by a conversion of the customer's securities; the conversion merely entitles the customer to offset his damages against his indebtedness to the broker. . . .

"We think the New York rule does exact justice between the parties . . . ." *Otis et al., Appellants, v. Medoff,* 311 Pa. 62, 67-69, 166 A. 245 (1933).

"A conversion by the broker does not extinguish the customer's indebtedness to him. It merely permits the customer to offset his claim for damages against the indebtedness. The broker, in spite of his wrong, is entitled to recover his advances, interest and commissions. The customer is entitled to his claim for damages. The two may be offset and the balance awarded to the party entitled to it," Meyer, The Law of Stock Brokers and Stock Exchanges § 141, pp. 576-577 (1931).

See also *Levy et al. v. Loeb et al.,* 89 N.Y. 386, 389 (1882).

No contrary authority having been furnished by the parties or found in our research, we conclude that as a matter of law plaintiff's wrongful cover neither extinguishes nor bars its right to recover defendant's account balance.

In his argument to us in support of the trial court judgments, defendant adopts the position that the trial judge erroneously held plaintiff rescinded the parties' contract. Defendant's position is understandable. Rescission is a *remedy* whether implemented by a contracting party or utilized as judicial relief. If it was appropriate for plaintiff to rescind, it necessarily required triggering conduct on defendant's part. Clearly, defendant disclaims failure of consideration to plaintiff, substantial breach by defendant, or any other conduct or state of events of the sort justifying rescission by plaintiff. We agree that under the facts of this case there was no rescission by plaintiff—there was (assumed) wrongful cover. Additionally, we conclude rescission cannot be an available judicial resolution of the parties' claims and contentions because the purpose of rescission is to return the parties to status quo, an impossibility in this case. See *Nordstrom v. Miller,* 227 Kan. 59, 605 P.2d 545 (1980); *Dreiling v. Home State Life Ins. Co.,* 213 Kan. 137, 515 P.2d 757 (1973); *Roberts v. Anderson,* 254 S.W. at 726; 17 Am. Jur. 2d, Contracts §§ 397, 504, 519.

In further support of the trial court judgments, defendant earnestly argues *Kouns v. Myers,* 118 Kan. 221, 235 Pac. 122 (1925), is controlling authority. That reliance is misplaced. *Kouns* is distinguishable. It is not a wrongful cover case. Kouns was granted return of her money paid to the broker on the theory that the broker was guilty of a wrongful failure to disclose.

We have discussed this case as if the account balance shown on plaintiff's books was $12,012 and as if plaintiff sought recovery for that amount. That is not entirely correct. The amount shown on the books and the amount sought was $13,012. The $1,000 difference represents plaintiff's claim for commissions. Because the parties have not discussed plaintiff's entitlement or nonentitlement to recover commissions in this case and because there is wholly insufficient factual information in the record to enable meaningful consideration by us, we decline resolution of the question.

We conclude that as a matter of law plaintiff should have and recover judgment on its claim in the principal sum of $12,012 and plaintiff should be granted judgment on defendant's counterclaim. Accordingly, the trial court judgment denying recovery by plaintiff is reversed and the case is remanded with directions to

enter judgment in favor of plaintiff in the principal amount of $12,012.