**Amanda CHAPARRO, Plaintiff,**

**v.**

**IBP, INC., Defendant.**

**Civ. A. No. 93–2200–GTV.**

United States District Court,
D. Kansas.

Jan. 4, 1995.

---

**1468**

David O. Alegria, McCullough, Wareheim & La Bunker, P.A., Topeka, KS, for plaintiff.

Terri Savely Bezek, John J. Jurcyk Jr., Frank D. Menghini, Douglas M. Greenwald, Gregory P. Goheen, McAnany, Van Cleave & Phillips, P.A., Kansas City, KS, Katherine E. Rich, Holman, McCollum & Hansen, P.C., Prairie Village, KS, for defendant.

## MEMORANDUM AND ORDER

VAN BEBBER, District Judge.

Plaintiff in this diversity jurisdiction suit against her former employer alleges that defendant wrongfully discharged her in violation of Kansas public policy. Plaintiff contends that her termination was in retaliation for plaintiff's exercise of her rights under the Kansas Workers Compensation Act. Defendant argues that plaintiff's termination was based on an excessive number of unexcused absences. The case is before the court on plaintiff's motion for partial summary judgment (Doc. 48) and defendant's motion for summary judgment (Doc. 53). Both motions address the issue of defendant's liability for retaliatory discharge. For the reasons set forth below, plaintiff's motion is denied and defendant's motion is granted in part and denied in part.

## I. Facts

The following summary contains uncontroverted facts as established pursuant to Fed. R.Civ.P. 56 and in accordance with D.Kan. Rule 206(c). Immaterial facts and factual averments not properly supported by the record are omitted.

Plaintiff Amanda Chaparro was hired by defendant IBP, Inc., which operates a meat processing plant, on April 25, 1989. Her first job was trimming cow tails after they had been removed and washed. In December 1990, plaintiff bid for a job dropping tails which involved cutting the tails off cows and throwing them down a chute to the washers and trimmers. One reason that plaintiff wanted to change jobs was that she felt dropping tails would be easier on her hand which had begun to swell and cause discomfort. IBP transferred her to the job of dropping tails in February 1990.

When plaintiff returned to work on September 4, 1990, after a 5–month maternity leave, she was not immediately placed in her former job dropping tails. The record is unclear as to what job she was assigned when she first returned, but plaintiff complained to the dispensary nurse on September 27, 1990, that the new job was causing pain and swelling in her left hand. Plaintiff was returned to her old job of dropping tails on September 28, 1990. Plaintiff continued to have pain and swelling in her left hand and she returned to the dispensary for treatment on October 19, October 22, November 1, and November 6, 1990.

The first absence which is relevant to plaintiff's ultimate discharge from employment occurred on October 29, 1990. That evening she left work to attend a scheduled doctor's appointment. She did not return to work that evening, nor did she call in to report that she would not be returning. On October 30, 1990, plaintiff returned to work with a doctor's note which stated that plaintiff had been under the doctor's care and would be unable to work until November 1, 1990. Plaintiff was then assessed an unexcused absence for failing to return to work or call in after her doctor's appointment the preceding day. Plaintiff discussed the unexcused absence with her supervisor who re-

fused to excuse the absence. She appealed this decision to Rick Nimrich, personnel department manager, who upheld the supervisor's action.

IBP's attendance policy calls for treating absences as either excused or unexcused. An employee is subject to discharge after incurring three unexcused or 12 excused absences in a 12–month period. IBP has no written procedure addressing the proper actions an employee must take when, after receiving permission to be absent for a doctor's appointment, the doctor visit is not completed until after the employee's regular shift. Neither do IBP rules specifically require an employee to return to work after leaving early for personal reasons. IBP rules call for treating absences due to doctor visits as excused absences.

The dispensary nurses continued to monitor plaintiff's condition, and on November 5, 1990, plaintiff was assigned to light duty on the paint crew and her supervisor was told that plaintiff should minimize the use of her left hand. On November 20, 1990, plaintiff reported that she was no longer having problems with her hand, and she was returned to her regular job of dropping tails on November 26, 1990. She continued to work at this job until December 7, 1990.

On December 4, 1990, plaintiff again reported problems with her left hand, and the dispensary nurse scheduled a doctor's appointment in order to have her hand examined. Plaintiff visited Dr. Welch on December 7, 1990, and was diagnosed as having work-related left carpal tunnel syndrome. Dr. Welch told plaintiff she should not use her left hand at work and also relayed this information to IBP. Plaintiff was also given a splint to wear at all times. Upon receipt of this information, Nurse Garcia in IBP's dispensary explained to plaintiff which available jobs would accommodate the restrictions. Plaintiff was then assigned to the labeling department where she was given the job of labeling boxes using her right hand. This assignment lasted through March 12, 1991. During this period, Dr. Welch added a restriction that plaintiff should work only in a warm environment. The doctor also diagnosed plaintiff as having work-related De-

Quervain's syndrome of the left wrist, and added a restriction that plaintiff was not to lift more than 20 pounds and was to wear an Ace bandage at work without the splint. During this period, plaintiff also continued to receive cumulative trauma disorder exams at the dispensary.

On March 5, 1991, plaintiff filed a workers compensation claim, and IBP received notification of the claim on March 8, 1991. In her claim plaintiff sought entitlement to temporary total disability benefits along with job accommodation and vocational rehabilitation evaluation.

On March 15, 1991, plaintiff was assigned to the laundry facility as part of the "welfare cleanup crew" after she reported to the nurse that the cold was affecting her hands. This job required plaintiff to hang laundry in employees' lockers and enabled her to work in a warmer environment. She continued in this job until April 11, 1991, when plaintiff was transferred to the low rendering operation. In this job plaintiff was required to operate, mainly by pushing buttons, a machine which ground up bones and fat. Plaintiff apparently had no physical problems in performing either the welfare cleanup or low rendering operator jobs.

On May 2, 1991, Nurse Shipley made an entry in plaintiff's dispensary records stating that plaintiff was to continue in the welfare cleanup job. The entry also stated that plaintiff was not to lift, push, pull, or carry over 10 pounds, and was not to grip, pinch, or reach above her shoulders. On May 6, 1991, Nurse Shipley reassigned plaintiff to the job of wrapping rounds, also known as hanging plastic on rounds. This job entailed taking plastic off a roll and wrapping a round with it. Nurse Shipley's records show that the reason for the change was "crewing," a term that refers to the process of matching available personnel to positions needing to be filled.

Plaintiff first complained to Nurse Shipley on May 6, 1991, that she could not wrap the rounds with one hand because it was too hard to take the plastic off the roll and also put it on the round with only one hand. Plaintiff also asked the nurse to take her off

the hanging plastics job because the over-head reaching motions it required were hurting her arm. In response, Nurse Shipley told plaintiff to do the best she could with one arm, despite the fact that the nurse knew that the job required the use of both hands.

At plaintiff's urging, Nurse Shipley phoned Dr. Welch on May 9, 1991, to ascertain whether the job was within plaintiff's restrictions. Based on the description of the job given by the nurse, the doctor determined that the wrapping rounds job fell within plaintiff's work restrictions and authorized her to continue on that job. During that telephone conversation, Nurse Shipley also told the doctor that it was not unusual for plaintiff to disappear for long periods of time during which she could not be found. Nurse Shipley does not recall the source of this information or the reason that she relayed it to the doctor. Plaintiff also visited Dr. Welch later the same day, May 9, 1991. According to the doctor's notes, plaintiff explained what the job entailed and Dr. Welch concluded that the job may require more pulling and straining than the doctor had inferred from Nurse Shipley's description. The doctor concluded, however, that the job was within plaintiff's restrictions.

On May 10, 1991, plaintiff visited the dispensary with complaints of fever, achiness, nausea, dizziness, and vomiting. Nurse Shipley sent plaintiff home because of her illness, told her to see her personal physician, to return to work only after getting a doctor's release, and to call in to work every day. Plaintiff alleges that she told the nurse she could not call in every day because she did not have a phone and the nearest phone to which she had access was two or three blocks away. Nurse Shipley does not recall plaintiff making this statement, but the nurse was aware that plaintiff's telephone had been disconnected when they attempted to call plaintiff earlier, on April 15, 1991.

Plaintiff, in her deposition testimony, alleges that she called in to work on May 11, 1991, and left a message on the answering machine that receives absentee calls. According to plaintiff, the message she left stated that she had made a doctor's appointment for May 13, the earliest available time, and that she would be back to work on that day after the appointment, or at the latest on May 14, 1991. IBP's records of employee absentee calls made to the answering machine in May 1991 are no longer available.

Plaintiff's attendance calendar, maintained by IBP's personnel department, shows that the number "12"—the code for an excused absence—had been written in the space for May 11. This was changed at some point to an "11", the code for a "no call" or "no show." Plaintiff's supervisor does not recall reporting to the personnel office that plaintiff's absence on May 11 was excused.

On the morning of May 14, 1991, plaintiff returned to the dispensary with a doctor's release form allowing her to return to work. The nurse sent plaintiff back to work. Later that day the decision was made to treat plaintiff's absences on May 11 and May 13 as unexcused because of her alleged failure to call in. The personnel manager, Rick Nimrich, also made the decision to terminate plaintiff's employment because these two unexcused absences, added to the unexcused absence on October 29, 1990, resulted in three unexcused absences in a 12–month period.

Plaintiff discussed the decision to terminate her employment with Mr. Nimrich and told him that in the past she had not been required to call in every day during an illness of which the employer was aware. Plaintiff also claims that she told Mr. Nimrich that she did call in on May 11. Mr. Nimrich refused to remove any of the absences from plaintiff's record or to recategorize any of them as "excused." If any one of the three absences had been excused, plaintiff's absenteeism would not have violated defendant's attendance policy and she would not have been terminated.

The only reason for plaintiff's termination, according to IBP, was that she incurred three unexcused absences in a 12–month period. She was not terminated for any inability to perform her job, and there was no indication that she was not fully capable of performing all the tasks assigned to her. Plaintiff's supervisor testified that based upon the 30, 60, and 90–day quality of work evaluations, plaintiff had been a satisfactory employee. IBP has light duty jobs available, such as picking bone chips and fat off the

belt, which would accommodate workers with restrictions similar to plaintiff's.

IBP supervisors and managers meet at a weekly safety meeting during which information about work-related injuries from the previous week are discussed. The supervisors and managers also meet for a quarterly safety meeting during which strategies for reducing workers compensation costs are discussed. Occasionally, IBP nurses and lawyers representing the company in workers compensation cases discuss those cases. No one at IBP ever told plaintiff she was being terminated because she had filed a workers compensation claim, and plaintiff has not seen any written evidence to that effect.

Between May 14, 1991, and September 1992, plaintiff was not employed and made no applications for employment. She left for Mexico in June 1991, and returned to the United States in March 1992. Plaintiff was released from medical treatment on September 14, 1992, and plaintiff then worked for one month as a grocery clerk. Between October 1992, and May 1993, plaintiff was not employed, nor did she apply for employment. Plaintiff worked at a restaurant from May 1993, until December 1993, and is currently employed at a fast food restaurant where she began working in February 1994.

After her termination, plaintiff pursued her workers compensation claim. During this time plaintiff made application for vocational rehabilitation benefits in order to receive training for a new job. In January 1993, plaintiff was examined by Dr. Donald Harder in connection with her workers compensation case. Dr. Harder told plaintiff that she would be restricted from repetitive movements, grasping and handling tools, and work that required pinching. Dr. Harder's report stated that he believed plaintiff was unable to return to work at IBP or any meatpacking facility.

## II. Summary Judgment Standards

Under Fed.R.Civ.P. 56(c), summary judgment is proper only if the evidence, reviewed in the light most favorable to the plaintiff, the party opposing the motion, demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. *See Deepwater Inv., Ltd. v. Jackson Hole Ski*

*Corp.,* 938 F.2d 1105, 1110 (10th Cir.1991). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. This burden may be discharged by showing that there is an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). A "material" fact is one "that might affect the outcome of the suit under the governing law," *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986), and a "genuine" issue is one for which "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

Once the moving party has properly supported its motion for summary judgment, "a party opposing ... may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Id.*

The substantive law regarding a claim will identify which facts are material in a motion for summary judgment, and only factual disputes that might affect the outcome of the case under governing law will preclude entry of summary judgment. *Id.* at 248, 106 S.Ct. at 2510. In this diversity case, the court applies Kansas law with the objective that the result obtained in this court should be the same result that a Kansas court would reach. *See Adams–Arapahoe School Dist. No. 28–J v. GAF Corp.,* 959 F.2d 868, 870 (10th Cir.1992).

In applying this standard, the court views the evidence, and all reasonable inferences derived from the evidence, in the light most favorable to the party opposing the motion. *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.,* 912 F.2d 1238, 1241 (10th Cir.1990). In this case, because the parties have filed cross motions for summary judgment, the court will consider each motion separately in applying the controverted facts in the light most favorable to the nonmovant.

## III. Retaliatory Discharge

Both plaintiff and defendant have moved for summary judgment on plaintiff's claim that she was discharged from employment in retaliation for having filed a workers compensation claim. For the reasons outlined below, both motions must be denied on this point.

■■■ Kansas generally follows the employment at will doctrine which holds that in the absence of a contract, either express or implied, between an employee and employer covering the duration of employment, the employment is terminable at will by either party. *See Johnson v. National Beef Packing Co.,* 220 Kan. 52, 54, 551 P.2d 779 (1976). Kansas recognizes a number of exceptions to the employment at will doctrine. One such exception applies to employees discharged in retaliation for the exercise of their rights under the Workers Compensation Act. *See Murphy v. City of Topeka,* 6 Kan.App.2d 488, 630 P.2d 186 (1981). This cause of action is "based on the theory that dismissal of employees for reasons violative of a particular public policy are actionable." *Brown v. United Methodist Homes for the Aged,* 249 Kan. 124, 135, 815 P.2d 72 (1991).

■■■ In order to establish a claim of retaliatory discharge, a plaintiff must show (1) that she filed a claim for workers compensation benefits or sustained an injury for which she might assert a future claim for such benefits; (2) that the employer had knowledge of plaintiff's compensation claim or the fact that she had sustained a work-related injury for which she might file a future claim for benefits; (3) that the employer terminated her employment; and (4) that a causal connection existed between the protected activity or injury, and the termination. *See Ortega v. IBP, Inc.,* No. 92–2351, 1994 WL 373887 at * 6 (D.Kan. July 1, 1994); *Pilcher v. Board of County Commissioners,* 14 Kan.App.2d 206, 213, 787 P.2d 1204 (1990). Plaintiff must establish her claim by evidence which is clear and convincing. *Ortega v. IBP, Inc.,* 255 Kan. 513, 527, 874 P.2d 1188 (1994). Evidence "is clear if it is certain, unambiguous and plain to the understanding. It is convincing if it is reason-

able and persuasive enough to cause the trier of facts to believe it." *Ortega,* 255 Kan. at 527, 874 P.2d 1188 (citing *Chandler v. Central Oil Corp.* 253 Kan. 50, 58, 853 P.2d 649 (1993)). Under Kansas law, clear and convincing evidence is not a quantum of proof, but rather a quality of proof. *Ortega,* 255 Kan. at 527, 874 P.2d 1188.

In this case, the undisputed facts show that plaintiff had filed a claim for workers compensation benefits, that the employer knew about the claim, and that the employer then terminated plaintiff's employment. The only question is whether there is a causal connection between plaintiff's termination and her filing the workers compensation claim.

■■■ The evidence, even when viewed in the light most favorable to the plaintiff, contains no direct proof that IBP terminated plaintiff's employment because she filed a workers compensation claim. This does not necessarily mandate summary judgment in favor of IBP. Retaliatory discharge cases must generally be proven by circumstantial rather than direct evidence because rarely will an employer admit to having discharged an employee in retaliation for exercising a right.

Taking the evidence, and the reasonable inferences drawn from the evidence, in the light most favorable to the plaintiff results in the following scenario. IBP received notification on March 8, 1991, that plaintiff had filed a workers compensation claim. Shortly thereafter, IBP assigned plaintiff to two light duty jobs and she was able to perform the duties associated with those jobs. IBP's nurse noted on May 2 that plaintiff should continue in a light duty position and abide by several restrictions on her activities. In spite of these noted restrictions and the fact that plaintiff was able to perform the light duty jobs she had been assigned, the nurse on May 6 reassigned plaintiff to a position which the nurse knew would require a violation of the restrictions set by plaintiff's doctor. The nurse also misrepresented to plaintiff's doctor the physical requirements of plaintiff's new job.

The facts viewed in the light most favorable to plaintiff would also include the following evidence regarding the unexcused ab-

sences which led to plaintiff's discharge. Plaintiff called in to IBP on May 11 and stated that she would be absent due to illness at least through May 13. The May 11 absence was originally recorded on IBP's records as an excused absence at the direction of an IBP supervisor. In spite of this, IBP charged plaintiff with two unexcused absences and terminated her employment pursuant to its attendance policy.

■ It could be argued that the foregoing facts establish only that plaintiff was treated unfairly, but not that her filing a workers compensation claim was the reason for the unfair treatment. The proximity in time, however, between IBP's knowledge of plaintiff's workers compensation claim and the adverse actions taken against plaintiff strengthen the inference of retaliatory motive. This principle is recognized in connection with retaliation claims brought under Title VII, *see e.g., Burrus v. United Telephone Co. of Kansas, Inc.,* 683 F.2d 339, 343 (10th Cir.) (no inference of retaliatory motive when termination occurred almost three years after employee filed charges), *cert. denied,* 459 U.S. 1071, 103 S.Ct. 491, 74 L.Ed.2d 633 (1982); *Miller v. Fairchild Ind., Inc.,* 797 F.2d 727, 731–33 (9th Cir.1986) (discharge two months after EEOC settlement agreement sufficient evidence of retaliatory motive to avoid summary judgment for employer), and would appear to be appropriate in analyzing common law retaliatory discharge claims. In this case, the adverse actions taken by IBP began only two months after IBP received notification of plaintiff's workers compensation claim.

■ While plaintiff's evidence is far from sufficient for establishing her claim on her motion for summary judgment, the facts viewed in the light most favorable to her support an inference that IBP retaliated against her for filing the workers compensation claim. Genuine issues of material fact preclude a finding that plaintiff was discharged for non-retaliatory reasons. For these reasons, IBP's motion for summary judgment on the issue of retaliatory discharge will be denied.

Plaintiff's motion for partial summary judgment on the issue of liability for retaliatory discharge must also be denied. The

evidence viewed most favorably toward IBP would show that IBP terminated plaintiff's employment solely due to her unexcused absences which were properly assessed. There is clearly insufficient undisputed evidence to establish that IBP discharged plaintiff because of her worker's compensation claim.

IBP also contends that even if the retaliatory discharge claim is not dismissed, the court should rule, as a matter of law, that (1) plaintiff is estopped from claiming that she was capable of working after May 14, 1991; or (2) that plaintiff has failed to mitigate her damages. According to the pretrial order, plaintiff is seeking damages from lost wages and benefits in the amount of $338,602.00. IBP bases its argument on plaintiff's testimony that she did not seek employment during the period May 14, 1991, through September, 1992, and during this period she took the position in her workers compensation case that she was unable to work. In the alternative, IBP argues that if plaintiff was able to work during that period but chose not to, she has failed to mitigate her damages.

The evidence viewed in the light most favorable to plaintiff does not support IBP's contention that plaintiff took the position in pursuing her workers compensation claim that she was unable to work. The only evidence relating to this charge is the fact that plaintiff applied for vocational rehabilitation benefits in order to be retrained. IBP has not supplied any undisputed evidence that plaintiff ever claimed she was unable to perform any work or that she could not have returned to the light duty assignments she had received at IBP.

■ In addition, the evidence that plaintiff was unemployed and not seeking work for a period of time after her discharge is insufficient in and of itself to establish that plaintiff has failed to mitigate her damages. Generally, a party is entitled to recover only her actual damages less those that might have reasonably been prevented. *Iseman v. Kansas Gas & Electric Co.,* 222 Kan. 644, 647, 567 P.2d 856 (1977); *Theis v. duPont, Glore Forgan Inc.,* 212 Kan. 301, 307, 510 P.2d 1212 (1973). In a wrongful discharge case, the measure of damages is the amount of wages for the period in question less the amount plaintiff earned, or with reasonable diligence could have earned in a comparable

job. *Lines v. City of Topeka,* 223 Kan. 772, 781, 577 P.2d 42 (1978). The record contains no evidence from which the court could compute the amount that plaintiff would reasonably have earned had she sought employment during the period in question. A ruling on whether plaintiff failed to mitigate her damages, and if so, by what amount plaintiff's damage claim must be reduced, is premature.

For these reasons, IBP's motion for summary judgment relating to plaintiff's damages arising out of her retaliatory discharge claim is denied.

### IV. Intentional Infliction of Emotional Distress

Plaintiff's complaint also alleged a claim for intentional infliction of emotional distress. Defendant has moved for summary judgment on this claim. To the extent that such a claim remains in the court's pretrial order, defendant's motion will be granted, and the claim for intentional infliction of emotional distress will be dismissed.

In order to maintain an action for intentional infliction of emotional distress, plaintiff must establish that (1) defendant's conduct was intentional or in reckless disregard of plaintiff; (2) the conduct was extreme and outrageous; (3) a causal connection existed between defendant's conduct and plaintiff's emotional distress; and (4) plaintiff's emotional distress is extreme and severe. *Anspach v. Tomkins Ind., Inc.,* 817 F.Supp. 1499, 1506–07 (D.Kan.1993) (citations omitted); *Taiwo v. Vu,* 249 Kan. 585, 592, 822 P.2d 1024, 1029 (1991). The court must determine whether defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery, and whether the emotional distress alleged by plaintiff is so extreme that the law must intervene because no reasonable person should be expected to endure it. *Taiwo,* 822 P.2d at 1029.

IBP contends that plaintiff has failed to demonstrate that IBP's alleged conduct was so extreme and outrageous so as to permit recovery. The court agrees. Plaintiff in her response brief did not address this part of defendant's summary judgment motion. The evidence, even when viewed in the light most favorable to plaintiff, fails to demonstrate any outrageous conduct on the part of defendant. In addition, plaintiff has failed to present any evidence of severe emotional distress. For these reasons, IBP's motion for summary judgment with respect to plaintiff's claim of intentional infliction of emotional distress will be granted.

IT IS, THEREFORE, BY THE COURT ORDERED that plaintiff's motion for partial summary judgment (Doc. 48) is denied.

IT IS FURTHER ORDERED that defendant's motion for summary judgment (Doc. 53) is granted in part and denied in part, as provided by this order.

Copies of this order shall be mailed to counsel of record for the parties.

**IT IS SO ORDERED.**